### MALATKOFSKI v. UNITED STATES.

### SEIGEL v. UNITED STATES.

Nos. 4460, 4461.

United States Court of Appeals
First Circuit.

Jan. 25, 1950.

Before MAGRUDER, Chief Judge, and MAHONEY and WOODBURY, Circuit Judges.

PER CURIAM.

Separate indictments were presented in the court below on December 6, 1948, charging Harry Malatkofski and his uncle Benjamin Seigel with offenses under 18 U.S.C. § 91 (1946 ed.).[1] The cases were tried together by order of the district court. Defendants were convicted upon verdicts of guilty, and each of them has taken an appeal.

18 U.S.C. § 91 (1946 ed.), so far as now relevant, provided as follows: "Whoever shall promise, offer, or give, or cause or procure to be promised, offered, or given, any money or other thing of value, * * * to any person acting for or on behalf of the United States in any official function, under or by authority of any department or office of the Government thereof, * * * with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, * * * shall be fined not more than three times the amount of money or value of the thing so offered, promised, given, made, or tendered, or caused or procured to be so offered, promised, given, made, or tendered, and imprisoned not more than three years."

The indictment of Malatkofski charged that Malatkofski, at Boston, Massachusetts, on or about May 6, 1946, "did knowingly and unlawfully give money, to wit, the sum of One Thousand Dollars ($1000.00), to an employee of the United States, a person acting for and on behalf of the United States Government in an official capacity, to wit, to Walter C. Cleary, Supply Officer of the Boston Regional Office of the Veterans' Administration, an agency of the United States Government, part of whose duties was the awarding of contracts to vendors for the sale of tools to the Veterans' Administration, * * * with the corrupt intent of influencing his action and

Jacob Spiegel, Boston, Mass. (Joseph J. Gottlieb and Thomas W. Lawless, Boston, Mass., with him on the brief), for appellants.

Joseph M. Hargedon, Assistant United States Attorney, Boston, Mass. (George F. Garrity, United States Attorney, Boston, Mass., with him on the brief), for appellee.

1. 1948 Revised Criminal Code, 18 U.S.C.A. § 201.

decision in the awarding of said contracts, which matter came before him in his official capacity, in violation of Title 18, United States Code, Section 91."

Seigel's indictment charged that Seigel, in Boston, Massachusetts, on or about May 6, 1946, "did knowingly and unlawfully cause to be offered and given money, to wit, the sum of One Thousand Dollars ($1000.00), to an employee of the United States", etc., the remainder of the indictment following in the exact words of the indictment of Malatkofski, as above set forth.

 Since the defendants were alleged "to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses", they might, under Rule 8(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. have been joined as defendants in a single indictment. Under these circumstances the district court was authorized by Rule 13 to order the indictments to be tried together. Each defendant moved for a separate trial on the general ground (no details being specified) that standing trial with the other defendant would be prejudicial. These motions for severance were denied. In this there was no error. The matter lay in the discretion of the trial judge, and no extraordinary facts appear from which it could be said that denial of the motions was an abuse of discretion. See Stilson v. United States, 1919, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154. Throughout the trial, whenever evidence was introduced which was competent against one defendant and incompetent against the other, the judge duly admonished the jury that the evidence was received only as against the one defendant and must be disregarded by them in their consideration of the case of the other defendant. See United States v. Ball, 1896, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300.

 Each defendant moved for dismissal of the indictment against him on the ground that it did not state facts sufficient to constitute an offense against the United States. These motions were properly denied. On this point, defendants advance what seems to us to be a hypercritical reading of the indictments. It is contended that under the statute it is an essential element of the offense that the intent must be to influence the decision of the official in a "matter * * * which may at any time be pending, or which may by law be brought before him in his official capacity"; in other words, that the specified time element requires the allegation of one of two alternatives, either that the matter be a pending one or that it be one which may come up in the future. And so, it is urged that the indictments are insufficient in that they "refer only to a *past* matter", great emphasis being placed upon the word "came" in the concluding clause, "which matter came before him in his official capacity". But the indictments charge that the money was paid to Cleary, the Supply Officer, "with the corrupt intent of influencing his action and decision in the awarding of said contracts". That must have been meant by the pleader to refer to matters which had not already been decided and disposed of by the Supply Officer before the bribe was given. Hence the clause "which matter came before him in his official capacity" might indeed be treated as surplusage, since it merely refers back to Cleary's constantly recurring procurement duties, already set forth in the language, "part of whose duties was the awarding of contracts to vendors for the sale of tools to the Veterans' Administration". At most the use of the word "came" was a grammatical infelicity. See Stumbo v. United States, 6 Cir., 1937, 90 F.2d 828, 831: "The question we have to decide is not whether the present indictment is a model pleading, or whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, so that the judgment may be a bar to further proceedings against him for the same offense." The present indictments amply meet that test. See also Hartwell v. United States, 5 Cir., 1939, 107 F.2d 359, 362; Norris v. United States, 5 Cir., 1946, 152 F.2d 808.

Malatkofski and Seigel both moved for judgments of acquittal at the close of the government's case. These motions were properly denied, for the government's evidence warranted conviction of both defendants, as we shall proceed to show; in fact, quite strongly indicated their guilt. Furthermore, the language of Cohen v. United States, 6 Cir., 1923, 294 F. 488, 491, is applicable here: "While the record shows a motion to instruct made at the close of the government's evidence, it does not show such a motion at any later time, and it is a familiar rule that such a motion is waived if the defendant proceeds to put in evidence on his own behalf, as he did here, and if the motion is not renewed at the close of all the evidence. Upon a record so framed, the appellate court will not consider the objection that the verdict is not supported by substantial evidence, unless the injustice done by the verdict seems clear and gross; but there was not in this case that miscarriage which would be required in order to persuade us to this unusual course."

It was established that Cleary was duly detailed as Acting Supply Officer of the Boston Regional Office of the Veterans' Administration on April 22, 1946, and that on May 6, 1946, he was appointed Supply Officer. In the administration of the veterans' vocational training program, when Cleary as Supply Officer received from the officer in charge of veteran trainees a certificate that certain tools were required by a trainee, it was a part of his duties to procure such tools for the trainee by placing an order therefor in the open market, provided the purchases for a single trainee were in amounts less than $100. Malatkofski was employed by five or six hardware dealers around Boston as a salesman on commission. In seeking out business, Malatkofski made the acquaintance of Cleary at the Boston Regional Office early in the spring of 1946. Cleary placed a large number of orders for purchases of tools through Malatkofski. The latter may not have known Cleary's official title or the official chain of authority under which he was appointed. But he admittedly knew that Cleary "was giving out orders on veterans' tools", and "thought he was purchasing agent", which was a not inaccurate description of Cleary's actual duties. As a matter of law, and the district court so told the jury, Cleary in his official capacity, first as Acting Supply Officer and later as Supply Officer, was acting for the United States in making purchases of tools for veteran trainees; and the jury was certainly warranted in finding that Malatkofski had sufficient knowledge of Cleary's official duties. See Daniels v. United States, 9 Cir., 1927, 17 F.2d 339, 343; Buckley v. United States, 6 Cir., 1929, 33 F.2d 713, 717; Cohen v. United States, 6 Cir., 1923, 294 Fed. 488, 490–91.

Cleary, as a witness for the government, admitted his own participation on the receiving end of the bribe transaction. He testified that on May 5, 1946, he and Warren Brown, another employee of the Regional Office having to do with tools for veteran trainees, went to the home of Malatkofski and asked him "for the thousand dollars against the orders that had already been placed for May, the 5 per cent that he guaranteed us on the orders that were already placed"; that Malatkofski said "he would have to see his uncle to make known the arrangements, but he felt quite sure he would get it"; that Malatkofski further emphasized his understanding that of course "they would get their continual business, the business they had been getting, and he also wanted reassurance that we would try to expedite his vouchers above all others." Even without this latter remark in the record, the inference would be reasonable that the giving of the thousand dollars to Cleary under the circumstances was not merely in fulfillment of a prior arrangement between the parties and in payment for past favors, but also had the purpose to induce Cleary to continue his official favors in the future pursuant to the deal under which they were operating. That is so, because, as Malatkofski must have realized, the surest way to sour Cleary on the deal and to dry up this source of government business in the future would have been for Malatkofski to renege on the payments which he had promised for the business he had already obtained.

through Cleary. Cleary further testified that on the next day, May 6, he and Malatkofski met by arrangement in a booth in the Grill Room of the Parker House and that Malatkofski passed to him under the table an envelope containing a thousand dollars in denominations of $100 bills. After the receipt of this payment, Cleary continued to place with Malatkofski a large volume of orders for veterans' tools. One witness, who had employed Malatkofski as salesman, testified that he made sales of tools to the Veterans' Administration through Malatkofski from May to the middle of June in the amount of approximately $25,000.

Some time in August, 1946, Cleary severed his connection with the Veterans' Administration. Cleary testified that at a later date, probably in February, 1947, he had conversation with Malatkofski in which the latter informed him that they were being investigated by the F.B.I.; that he, Malatkofski, had refused to talk to an F.B.I. investigator, "and wanted to be reassured that I had not done any talking along that line"; that Malatkofski "inquired if I had stated to the F.B.I. that I had received that thousand dollars", and stated further to Cleary that "if we all stuck together and denied the fact that there was any such act that had taken place, then they had no evidence."

In developing the case against Seigel, the government produced three witnesses, who testified to various conversations with Seigel during which Seigel admitted that he had raised the thousand dollars and supplied the same to his nephew Malatkofski to give to Mr. Cleary; and Seigel several times stated, according to the testimony of these witnesses, that his object in advancing the money was to enable Malatkofski to place more business with the Veterans' Administration, and also to expedite the payment of vouchers for purchase orders that had already been obtained. One of these witnesses quoted Seigel as stating that he had instructed Malatkofski to meet Cleary at the Parker House and to be sure to have a witness present who could see the passing of the money. This witness further stated: "I asked him whether or not the thousand dollars had been passed and he said that it had, and that Walter Cleary had received the money from Malatkofski." Cleary testified that shortly after he received the payment of the thousand dollars Seigel came to his office to make a complaint on the erroneous assumption that Cleary was withdrawing some of the business from Malatkofski; that Seigel said "he invested this much money in this business and didn't intend to see it lost"; that Cleary tried to reassure Seigel, and in fact continued to place orders with Malatkofski after that time.

The defendants admitted the payment of the thousand dollars by Malatkofski to Cleary, but insisted that it was merely an innocent personal loan, with no thought of influencing official action by the Supply Officer.

Malatkofski testified that Cleary had previously borrowed small sums from him, and had always paid him back. He testified that on May 5, 1946, when Cleary called at his home, Cleary stated that he was in great financial trouble and had to have help to the amount of $2000; that Malatkofski demurred at the sum requested, but finally said that he might be able to obtain $1000 from his uncle. He testified that he did borrow $1000 from Seigel without, however, informing Seigel what he wanted it for; that he gave this money to Cleary, not surreptitiously as Cleary had testified, but openly and with the distinct commitment on Cleary's part that he would repay the money within three or four weeks.

Seigel testified that early in May, 1946, his nephew Malatkofski came to him and borrowed a thousand dollars without giving him any evidence of indebtedness; that he, Seigel, had no idea at that time that the money was going to Cleary; that he was in the real estate business, and not interested in his nephew's hardware business; that subsequently he went down to the Veterans' Administration and complained to Cleary's superiors that Cleary "had a thousand dollars of my money", and that he wanted it back; that he said to Mr. Blake, Cleary's superior, "Why should he borrow from Al Malatkofski? He is earn-

ing a weeks pay the same as Malatkofski. Malatkofski has got three children to support."

On the record as a whole, it cannot be said that the verdicts were lacking in evidential support.

■ Another argument by appellants is based upon an overrefined reading of those portions of the indictments which describe Cleary's duties as including "the awarding of contracts to vendors for the sale of tools to the Veterans' Administration" and allege that the money was paid to Cleary with the corrupt intent to influence "his action and decision in the awarding of said contracts". The evidence showed that Cleary had no authority to award contracts for procurement of supplies in excess of $100 in amount; that in such cases permission had to be obtained from Washington and the procedure of advertising for bids was followed. It was also established that all the orders which Cleary placed through Malatkofski were in amounts less than $100 for a single trainee, in which cases Cleary was authorized to purchase the articles in the open market and thus could throw the business to one hardware dealer or another without advertising for bids. It is argued that the motions for judgments of acquittal should have been granted, because the government presented no evidence of the awarding of contracts by Cleary and concerned itself solely with purchases under $100, and thus there was a "fatal variance" between the indictments and the proof, in view of the well-understood distinction, so far as government agencies are concerned, between open-market *purchases* and the awarding of *contracts*. Though the contention is urged with apparent earnestness, it seems to us wholly lacking in substance. Whatever importance the asserted distinction may have in other connections, it is not likely that the pleader was using the words "the awarding of contracts" in such a special sense. When Cleary placed an order for a purchase through Malatkofski, and the tools were delivered by the supplier pursuant to the order, a unilateral contract came into being under which the government was obligated to pay for the tools.

This amounted to the awarding of a contract in an ordinary use of the term. If Malatkofski paid money to Cleary to induce Cleary to place such orders with hardware dealers for whom Malatkofski was acting as salesman, an offense was undoubtedly committed under the statute. Malatkofski of course was thoroughly familiar with the procedure under which Cleary operated in making open-market procurement of supplies, and could hardly claim that the proof offered took him by surprise in view of the allegations of the indictment. If there was any variance at all, which we doubt, it must be disregarded as not having affected any substantial rights of the defendants. Rule 52(a), Federal Rules of Criminal Procedure. See Berger v. United States, 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; Panella v. United States, 4 Cir., 1944, 140 F.2d 71; Carothers v. United States, 5 Cir., 1947, 161 F.2d 718; Norris v. United States, 5 Cir., 1946, 152 F.2d 808.

Appellants complain of prejudicial conduct by the Assistant U. S. Attorney in the course of cross-examination:

■ Seigel took the stand as the first defense witness. In cross-examination, after two or three questions had been asked and answered as to the various names by which Seigel was known, the following brief episode occurred:

"X–Q. Are you commonly known as 'Illegal Seigel'? A. No, sir.

"Mr. Spiegel: I object.

"Mr. Hargedon: He answered it."

The inquiry probably would have been a proper one if Seigel had already put his own reputation in issue. Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213. This he had not done, but he did do so a few minutes thereafter, by calling to the stand five character witnesses in succession. We assume that the question was improper at the time it was put, but it was answered before counsel objected. There the matter was allowed to rest. The court was not requested to declare a mistrial, or to caution the jury to ignore the question and the intimation conveyed. Under the circumstances, we do not believe the judg-

ment against Seigel should be reversed on this account.

Objection is also taken to the cross-examination of a character witness called on Seigel's behalf. We quote the incident in its entirety:

"X-Q. Did you ever hear he [Seigel] was in Malden Court for conspiracy to steal?

"Mr. Spiegel: I object.

"The Court: I allow it.

"A. No, sir.

"X-Q. And that he was let go upon restitution of $500—did you ever hear that? A. No.

"Mr. Hargedon: That is all.

"Mr. Spiegel: My objection is noted?

"The Court: Yes, your objection is noted. Have you some evidence, Mr. Hargedon, of that?

"Mr. Hargedon: Yes.

"The Court: I want your proof on that."

██ The government would not have been permitted, as part of its main case, to put in evidence that Seigel had been arrested for conspiracy to steal, for it is considered that a jury, without fairly weighing the other evidence, might be too readily disposed to draw from the fact of Seigel's prior brush with the criminal law (if it was a fact) the inference that he was probably guilty of the offense now under indictment. But the question here involved occurred in cross-examination of a character witness, who had testified on direct examination that Seigel's reputation was good. Seigel thus sought to derive benefit from the chain of reasoning that since his reputation is good, his actual character must also be good, and that since his character is good it is improbable that he committed the alleged offense. By cross-examination, the prosecution should be allowed to undermine the foundation of this chain of inferences by showing that the character witnesses were actually aware of certain derogatory public reports. If it was common talk around that Seigel had previously been brought to court for

conspiracy to steal and had been let off only upon making restitution of $500, this certainly would have adversely affected his reputation, which, by his own choice, was now in issue. If the character witness has testified positively that the defendant's reputation is good, but on cross-examination is compelled to admit knowledge of derogatory rumors, the standards by which the witness judges reputation will appear to be dubious, and the positive effect of his direct testimony weakened. Hence the Supreme Court, after carefully weighing the considerations of policy and logic *pro* and *con,* came to the conclusion in Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213, in accordance with the quite generally accepted view, that such a line of inquiry might be permitted in cross-examination of character witnesses.

It is true that in the Michelson case, where the prosecutor asked a similar line of questions, the trial judge satisfied himself out of the hearing of the jury that the prosecution had a factual basis for the questions, after which he allowed the questions and answers to stand.[2] It would be an act of gross misconduct, calling for drastic corrective measures by the judge, if the prosecutor should ask such questions in bad faith, expecting from the witness a negative answer, but calculating that a residue of false and damaging insinuation would lodge in the minds of the jurors. In the case at bar the judge, after the questions had been asked and answered, indicated that he wanted the prosecutor's proof upon the basis of which the questions had been propounded. So far as the record discloses, the matter was not followed up by anybody, neither the prosecutor, nor counsel for the defense, nor the judge. The government in its brief before us has quoted an extract from an F.B.I. report which it is stated was before the prosecutor at the time he asked the questions, but which report is not a part of the record. According to this report, the records of the Malden Police Department indicate that Seigel was taken in custody in 1936 on a charge of conspiracy to steal and a month later

2. See the comment on this procedure in 335 U.S. at page 481, note 18, 69 S.Ct. 221.

was adjudged not guilty "on payment of $500 restitution before Judge Dowd in the Middlesex Superior Court, Cambridge, Mass." Possibly the prosecutor handed this F.B.I. report up to the bench at the time and thus satisfied the judge on the point, but this is only conjecture. Obviously, if Seigel had not in fact been before the Malden court on a charge of conspiracy to steal, the defense could have brought proof to this effect and thus have made a great point of the prosecutor's malfeasance in seeking to damage the defense by an insinuation made out of whole cloth. Because a stratagem of this sort would leave the prosecutor so vulnerable, it is not unreasonable to assume that he had a factual basis for the line of inquiry. At any rate for reasons doubtless deemed sufficient, counsel for Seigel elected to let the episode stand on the record above quoted.

 It is true, also, that in the Michelson case the trial judge, of his own motion, instructed the jury on three separate occasions as to the limited purpose for which the question was allowed to be asked of the character witnesses, namely, merely to test the witnesses' standard of opinion as to the reputation of the defendant; that regardless of the answers, "you are not to assume that the incident asked about actually took place." In the case at bar, counsel for Seigel objected to the questions generally but did not ask the court to instruct the jury as to the limited purpose for which the questions were allowed. It is often thought that the giving of such limiting instructions may do the defendant no good, and may, upon the contrary, overemphasize the matter to his detriment in the minds of a confused jury. A general objection to evidence will not prevail if the evidence is competent for any purpose, and the rule is that the objecting party must call the attention of the judge specifically to any limitations which he believes should be imposed upon its application to the issues; in the absence of a request by counsel to that effect, it is at least ordinarily not error for the judge to refrain from giving such limiting instructions. Solomon v. Dabrowski, 1936, 295 Mass. 358, 359, 3 N.E.2d 744, 106 A.L.R. 464; Chess v. Grant, 4 Cir., 1908, 163 F. 500, 502–503; Adamson v. United States, 8 Cir., 1910, 184 F. 714; Wigmore on Evidence, § 13(2), 3d Ed. 1940. The failure of counsel to ask for such an instruction in the present case may indeed have been due to the estimate that, if the question were a proper one for any purpose, the least said about it the better, from the point of view of the defendant.

For these reasons we find no reversible error in the above cross-examination of the character witness.

 Objection is made to the action of the trial judge in curtailing cross-examination of the key government witness, Cleary, by counsel for Seigel. This point, if it had merit, would be available only to Seigel, not to Malatkofski. We set forth in the footnote the entire cross-examination of Cleary by Seigel's counsel.[3]

3. "X–Q. You are certain that your first request for this money was not in the nature of a loan? A. I am.

"X–Q. Did you ever at any time return $600 through someone else? A. I did not.

"X–Q. Did you ever give $600 to a Mr. Auranski, to return? A. I did not.

"X–Q. At the time you got this money from Malatkofski did you say to anyone you needed the money for a loan? A. That I need the money for a loan?

"X–Q. Yes. A. To the best of my knowledge, no.

"The Court. May I see counsel up here just a second.

"[Conference at the bench, following which Mr. Spiegel makes the following offer of proof:—

"Mr. Spiegel. I offer to prove through this witness that he had originally requested a loan from Malatkofski; that Malatkofski received the money from Seigel for the purpose of a loan; that Cleary knew at that time that Malatkofski had not told Seigel that he was going to give the money to Cleary; and that it was only after Seigel complained to Mr. Blake about the fact of its being a loan that Cleary heard of it and gave $600 in money to Auranski to give to Seigel as a return for the loan.

"I offer further to prove that this witness was in domestic and financial difficulties at the time; and I offer further to prove that it was common for him to make a number of loans from Malatkofski, having done it on previous occasions,

Cleary having testified on direct examination that the thousand dollars had been given him by Malatkofski as the agreed bribe for extension of official favors, it was a proper object of cross-examination to seek to discredit this testimony by obtaining an admission from Cleary that the transaction was merely a personal loan, or an admission from him of conduct or prior statements which tended to indicate his understanding ·of the transaction as a loan. Therefore, so far as we can see, the opening questions were appropriate for cross-examination. At that point the court called counsel to the bench; just why, does not appear, nor does the record set forth what took place at the bench conference. Counsel for Seigel then made a statement of some things he hoped to prove through further cross-examination of the witness. At least in part, the indicated line of inquiry would seem to have been proper for cross-examination. In fact, some of the subject matter had been touched upon in the preliminary questions which the court had allowed. Some of the matters sought to be inquired about were, perhaps, sufficiently outside the scope of the direct examination so that the judge in his discretion might have excluded cross-examination thereon. Apparently the judge did not rule that counsel could not pursue the indicated line of inquiry at all, but merely that he would not permit the subject matter referred to to be explored further on cross-examination, and he invited the defense "to call this witness as their own witness on direct." If, as well may be, the judge was in error in excluding some of these questions from cross-examination, nevertheless it was not prejudicial error in view of the alternative which the judge offered and of which counsel chose not to avail himself. If Cleary had been made a defense witness, he could have been asked the proposed questions; and as he would have been obviously hostile, counsel would have been allowed to lead the witness.

Certain forms of impeaching the witness might not have been available in that event, which would have been the only disadvantage. See Wigmore on Evidence, § 896 et seq., 3d Ed. 1940. But it is to be noted that the judge did not rule that counsel for Seigel would not be permitted to impeach Cleary on cross-examination. As indicated by the somewhat vague offer of proof, the line of inquiry which the judge excluded on cross-examination was not in the nature of impeachment, technically so called, and the questions excluded could have been asked on direct examination of Cleary as a defense witness. Why counsel for Seigel dropped the cross-examination at that point does not appear. After the ruling on the offer of proof, the prosecutor asked if counsel for Seigel was finished with the cross-examination, to which the court answered "Apparently"; and the prosecutor then called his next witness. It is fairly to be inferred that the judge would have allowed counsel to continue with the cross-examination, except as to the excluded matters, if counsel had indicated a desire to go on. In such further cross-examination, counsel would have been at liberty to seek to impeach the credibility of Cleary, in the ways usually sanctioned. Incidentally, counsel for Malatkofski had sought unsuccessfully on cross-examination of Cleary to establish that the transaction was a loan, and ·it is unlikely that counsel for Seigel would have succeeded where the other· counsel had failed. We conclude that the action of the trial judge in the matter of the cross-examination of Cleary is not ground for reversal. On this record the case is quite different from Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, where the judge cut off *in limine* cross-examination designed to uncover a motive in the witness for lying.

Certain objections to the charge have been urged, but we think they are without

on one of which he g\ ve a message to Walter Brown, in which he requested Malatkofski to give $25 to Brown to give to Cleary.

"The Court. The court excludes this and allows the defense to call this witness as their own witness on direct.]

"The Court. Next witness.

"Mr. Hargedon. Are they finished?

"The Court. Apparently.

"Mr. Hargedon. Mr. Sheehey."

merit. The charge fairly and sufficiently defined the legal issues. Having charged as a matter of law that Cleary in his official position was acting for the United States in making purchases of tools, the judge told the jury that if they should find, in accordance with the defendants' theory of the evidence, that Malatkofski merely made a personal loan to Cleary as a favor, and without the intent of influencing Cleary's decision in the purchase of tools, they should acquit the defendants. But since the statute applies not only to the giving of money but also of any "other thing of value", the jury were told that, whether the handing over of the money by Malatkofski was as a gift or as a loan, if it was done with the intent to influence Cleary's official action, then, the other elements being proven, the crime of bribery would be established. It was explained to the jury that under the evidence, if they found Malatkofski not guilty they would have to acquit Seigel also; but that even if they found Malatkofski guilty, they would nevertheless have to acquit Seigel if they believed his story that he furnished the money to his nephew without knowing what Malatkofski intended to do with it. Specifically, the court instructed that if the jury should find that Seigel gave the money "to Malatkofski for the purpose of giving it to Cleary to influence Cleary in his decision as to where he would place orders, or that he knew what Malatkofski was going to do and gave him the money to do it, then you would find him guilty; otherwise you would find him not guilty."

At the close of the charge counsel went to the bench and offered two objections to the charge as given.

Counsel for Seigel objected to that portion of the charge which permitted the jury to find Seigel guilty if he furnished the money to Malatkofski knowing that Malatkofski was going to use it to bribe Cleary. The objection is that that mere knowledge would not be enough, that Seigel must have given the money to Malatkofski with the specific direction to Malatkofski to use it for the corrupt purpose aforesaid; and more than that, if we may judge from one of the requests to charge which had been submitted by Seigel, it seems to be contended that Seigel could not be guilty unless the criminal intent to influence Cleary "originated in the mind of the defendant, Seigel." The point is not well taken. If Seigel furnished the money to Malatkofski knowing that Malatkofski intended to give it to Cleary to influence his official action, and Malatkofski did so apply the money with that corrupt intent, then Seigel did knowingly and unlawfully cause to be given to Cleary a sum of money with the corrupt intent of influencing his official action, as alleged in the indictment. One who assists another by supplying the means wherewith the other executes a declared criminal purpose "causes" the commission of the offense, notwithstanding the fact that the offense is immediately committed by the voluntary act of the other criminal actor. Backun v. United States, 4 Cir., 1940, 112 F.2d 635, 637–638; Rosencranz v. United States, 9 Cir., 1907, 155 F. 38, 41–42; Bacon v. United States, 10 Cir., 1942, 127 F.2d 985, 987; Reid v. United States, 7 Cir., 1930, 44 F.2d 51, 53.[4] Furthermore, even if the portion of the charge now objected to was technically inaccurate, it could hardly have

4. The phrase "or cause or procure to be promised, offered, or given," appearing in 18 U.S.C. § 91 (1946 ed.) does not appear in the current version of this crime in the recently enacted revision of Title 18. See 18 U.S.C.A. § 201. The explanation for the omission contained in the Reviser's Notes is as follows: "Reference to persons causing or procuring was omitted as unnecessary in view of definition of 'principal' in section 2 of this title." Section 2 providese that (a) whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission is a principal, and (b) whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such. Subsection (b) was new material added, according to the Reviser's Notes, to remove all doubt that one who "causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense."

917

affected the outcome of the case. According to the defendant's evidence, Seigel furnished the money to Malatkofski without knowing what the latter intended to do with it. If the jury believed that, they were instructed to acquit Seigel. On the other hand, the evidence offered by the government of alleged admissions by Seigel was to the effect that Seigel not only knew what Malatkofski proposed to do with the money, but advanced the money to Malatkofski because he wanted to enable his nephew to obtain more business by bribing the government official. If the jury believed the government witnesses, Seigel was certainly guilty.

Counsel for Malatkofski objected to that portion of the charge stating that Malatkofski would be guilty whether he handed over the money as a gift or as a loan, provided he did so with the corrupt intent to influence Cleary's decision in awarding the orders for the purchase of tools. It is conceded that under the statute the crime of bribery may be committed by the making of a loan to an official for the corrupt purpose, as well as by making an outright gift of money. But the point made is "that the charge in the indictment is the giving of money and not the loaning of money." When the indictment charges that Malatkofski "did knowingly and unlawfully give money" to Cleary, with the corrupt intent, etc., it may be that the word "give" is used as meaning merely that Malatkofski handed over to Cleary a sum of money, with the corrupt intent, etc.; and in this reading, the charge in the indictment would be proved whether the evidence showed that the money was handed over as an outright gift or as a loan. In any event, the point is unimportant because if the proof may be said to be at variance with the charge it is an inconsequential variance. The defendant cannot be said to have suffered any prejudicial surprise nor have his substantial rights been affected in any other respect. It is perfectly clear that, whether the handing over of the money was as a gift or as a loan, Malatkofski cannot be prosecuted again for the crime of bribery incident to this particular transaction.

One of the requests to charge, submitted by Malatkofski, was as follows: "If you find that Walter C. Cleary demanded or requested the money from the defendant, Malatkofski, and that this demand or request was the cause of the alleged transfer of money from the said Malatkofski to the said Cleary, then you must find the defendant, Malatkofski, not guilty." This request was not given in the charge, but the omission was not called to the court's attention at the conclusion of the charge. Under Rule 30, Federal Rules of Criminal Procedure, Malatkofski is not entitled to "assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." However, an appellate court in its discretion may consider a plain error affecting substantial rights although it was not brought to the attention of the trial judge. Rule 52(b). We shall comment briefly on the point, which is urged seriously in appellants' brief.

The quoted request to charge was based upon the theory that the corrupt intent to bribe an official must originate in the mind of the defendant, and that there can be no conviction of bribery if the corrupt intent was lodged in the defendant's mind by the suggestion of the public official. Cleary's testimony was that on his own initiative he went to Malatkofski's house and asked for payment of the thousand dollars in fulfillment of their prior working arrangement; but it is en-

That situation is not involved in the case at bar. Subsection (a) was already in the law, and had been so for a long time. See 18 U.S.C. § 550 (1946 ed.). Therefore, even without the clause in 18 U.S.C. § 91 (1946 ed.), "or cause or procure to be promised, offered, or given," etc., Seigel, as one who aided or abetted

Malatkofski in the latter's criminal offense of bribery, could have been indicted as a principal charged with "giving" money to Cleary with the corrupt intent, etc. See Backun v. United States, 4 Cir., 1940, 112 F.2d 635, and the other cases cited above in the text of this opinion.

tirely consistent with this testimony that the corrupt arrangement under which the bribe was paid originated in Malatkofski's mind. Moreover, nothing in the language of the statute suggests that the crime of bribery is negatived if the evidence shows that the first overtures came from the public official indicating that he would be receptive to the tender of a bribe. We say with assurance that such is not the law and that such an interpolation read into the language of the statute would largely emasculate it. Appellants are confused at this point by the cases on the defense of entrapment. The rule on entrapment, as stated in Peterson v. United States, 9 Cir., 1919, 255 F. 433, is that "where the officers of the law have incited a person to commit the crime charged, and lured him on to its consummation with the purpose of arresting him in its commission, the law will not authorize a verdict of guilty." In Capuano v. United States, 1 Cir., 1925, 9 F.2d 41, this court applied the rule of entrapment in an indictment for bribery. We held that the defendant was entitled to an instruction that if the defendant never conceived any intention of committing the offense of bribery but the officers of the government incited and lured the defendant to commit such offense "in order to entrap, arrest, and prosecute the defendant therefor," then the defendant should be acquitted. In the case at bar, there is not a shred of evidence that Cleary solicited the payment of the money in order to entrap Malatkofski into arrest and prosecution for bribery. The entrapment cases have no present application. See Sorrells v. United States. 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

The remaining question has to do with the sentences. In addition to sentences of imprisonment, Malatkofski was fined $500 and Seigel $1000. The statute provides that the fine shall be "not more than three times the amount of money or value of the thing so offered, promised, given," etc. Since the court charged that the jury might convict if the payment, whether by way of gift or loan, was made with the corrupt intent to influence Cleary's official action, and since the jury brought in general verdicts of guilty, it is said that there is now no way of knowing whether the jury found the transaction to have been a gift or a loan. Hence, the argument is that the judgments should at least be reversed as to the fines, since the value of a thousand dollar loan, payable on demand, which the jury might have found was the "thing of value" given, would be a negligible sum, and the fines imposed, under such view, would be in excess of that authorized by law.

■ In certain cases, a troublesome question might be presented under this statute whether it is the function of the judge or the jury to make the finding as to the value of the thing given by way of bribe, as the basis for the imposition of the fine. This is not a situation where the statute imposes a fixed maximum limit on the fine, and the judge, within the statutory limit, has discretion to determine the fine upon such considerations as appear to him persuasive. Here, the enormity or gradation of the offense, as indicated by the variable maximum fine authorized by law, depends upon a factual element, namely, the value of the thing given. It is in that respect not unlike the distinction between grand and petit larceny. If, then, the proof should show that the thing given by way of a bribe was an Oriental rug, it may be that the judge should instruct the jury that in the event they arrive at a verdict of guilty they shall make a special finding as to the value of the rug. It may indeed be that under the accused's constitutional right of trial by jury the judge would have to adopt this procedure as preliminary to the imposition of a fine which would be authorized by law if the rug was worth so much, and not authorized if the rug was worth less. But cf. People v. Caruso, 1928, 249 N.Y. 302, 164 N.E. 106, applying § 1944 of the New York Penal Law, McKinney's Consol.Laws, c. 40; also People v. Sandoval, 1941, 262 App.Div. 288, 28 N.Y.S.2d 370; People v. Martin, 1943, 180 Misc. 163, 44 N.Y.S.2d 368.

■ The suggested difficulties do not bother us in the case at bar. The word "give" in the statute is not, we think, used.

in the sense of "to bestow without a return" or "to make a present of", but rather in another well-accepted sense of "to deliver or hand over". In the latter sense the evidence is undisputed that Malatkofski gave (i. e., handed over to) Cleary one thousand dollars in cash, and this is so whether the transaction was dressed up as an ostensible loan or as a "present". Therefore the maximum fine that might have been imposed in each case was $3000, or "three times the amount of money * * * given [delivered or handed over with the corrupt intent], * * * or caused * * * to be * * * given". There is good sense in this interpretation of the statute, for the legal effect of handing over the money to Cleary with the corrupt intent as established by the verdicts was the same whether it was understood as a gift or as a loan. If the latter was the understanding, Cleary nevertheless got title to the thousand dollars, and his promise to repay the "loan", as part of an illegal transaction, was wholly unenforceable. See Clark v. United States, 1880, 102 U.S. 322, 26 L.Ed. 181; Boylston Bottling Co. v. O'Neill, 1919, 231 Mass. 498, 121 N.E. 411, 2 A.L.R. 902; Williston on Contracts, § 1630, Rev. Ed. 1937.

For another reason, also, we would be reluctant to upset the fines here. While it was abstractly true, as the jury were told, that the payment was a crime whether understood as a gift or as a loan, provided it was made with the requisite corrupt intent, yet if the jury believed the government witnesses, as it seems they did, they must have found that the money was paid over without any expectation of return except the receipt, under the corrupt arrangement, of the official favors at the disposal of Cleary. We discount the negligible possibility that the jury might have believed defense testimony to the extent of finding that the money was lent to Cleary, and believed the government testimony to the extent of finding that the accommodation was as a bribe to influence Cleary in the awarding of purchase orders.

The judgments of the District Court are affirmed.