JOHN W. KENNA, Appellant, *v.* DAILY MIRROR, INC., and Others, Respondents.

ANNA KENNA, Appellant, *v.* DAILY MIRROR, INC., and Others, Respondents.

First Department, April 23, 1937.

*Richard J. Mackey* of counsel [*Mackey, Herrlich & Breen*, attorneys], for the appellants.

*Manheim Rosenzweig* of counsel [*Charles Henry* with him on the brief], for the respondents.

GLENNON, J. The actions are based upon an alleged libelous editorial which appeared in the *Daily Mirror* on February 16, 1931. The plaintiffs, mother and son, instituted separate actions in which each demanded damages. By stipulation of counsel for the respective parties, the two actions were tried together and separate verdicts, rendered. The cases were submitted to the jury in a charge which we believe adequately covered the law and the facts. No exceptions were noted to the main charge. However, the court granted exceptions to its refusal to charge certain written requests, which appear in the record.

The editorial which formed the basis of the two actions reads as follows:

" How to Bank $237,865 in Six Years on an Annual Salary
of $3,500!

" It is amazing that ambidextrous thieves who wax fat on graft under the most corrupt city administration since Boss Tweed's day take so few precautions to account for their possession of great wealth which cannot by any possibility have been acquired honestly.

" No more extraordinary spectacle could be imagined than that presented by ' Ma ' Kenna, mother of Tenderloin Police Lieutenant John W. Kenna, wriggling on the cross-examiner's griddle as she sought to explain how her son Johnny could bank $237,865 in six years on his pay of $3,500, rising to $4,000.

" The fast-thinking old lady with work-gnarled knuckles, who washes and irons Johnny's shirts at home, fought valiantly to account for the huge sum deposited in her name. Of course, her Johnny always gave her his salary and she banked that. He made ' fortunate ' investments, but she did not know what they were. When all was said and done, only $119,000 of the total had been accounted for.

" Thus cornered, this immigrant wife of a retired New York street sweeper told the investigators she had made large sums in real estate. Her success in realty transactions always was phenomenal, she smiled. The examiner smiled, too. Honest citizens of New York will smile grimly. The witness had taken refuge in a blind alley. Realty transactions can be traced easily. Kenna, also a witness, comprehending this, revealed his disquietude. There will be more questions involving real estate — many more.

" Possibly, as Judge Seabury suggested, part of the cash in bank credited to Kenna is held in escrow for higher ups. Did Kenna cheat the cheaters, accounting in part for his own opulence? If a lieutenant of police grafts $35,000 annually, what does a captain get? What does an inspector get? Tenderloin graft, the Mirror is informed, reaches $1,500,000 a month.

" ' I do not believe,' remarks the court, ' that money collected by members of the vice squad from persons having cases in magistrates' courts remains in large part with the collectors. We must find where it goes and who gets it.'

" Let the facts come out! Poor, tired and sick Mr. Kresel certainly started something. Some gentlemen will be more sick than Mr. Kresel if the truth continues to come out."

If the matter complained of had not been predicated upon testimony and statements made in connection with a judicial proceeding we would have no hesitation in stamping it libelous *per se*. It may well be that the plaintiffs were the victims of a charge of dishonesty which had no foundation in fact. However, for the purpose of discussion of the legal points involved we must bring ourselves back to the time when the editorial was published.

Pursuant to a request of the Governor, this court, on its own motion, entered an order on the 25th day of August, 1930, wherein Hon. Samuel Seabury was appointed referee to conduct an investigation of the Magistrates' Courts in the First Judicial District, and the magistrates thereof in accordance with the provisions of the statutes. Subsequently, under date of September 23, 1930, the order was amended so as to confer additional power upon the referee to conduct an investigation of any practices of attorneys

in the Magistrates' Courts " which are obstructive or harmful to the administration of justice or unjust or corrupt, unlawful, fraudulent or unprofessional." During the course of the next few months, widespread publicity was given to the different developments of the investigation. It became a matter of public interest.

The plaintiffs were examined by the members of the referee's staff, first in private and then at a public hearing concerning large bank deposits. At the conclusion of the public hearing on February 13, 1931, the referee said: " In view of this evidence and some of the other evidence that we have had relating to similar subjects, I want to say to you gentlemen who are cooperating with me here that I do not believe that the money that has been collected by members of the Vice Squad from persons having cases in the Magistrates' Courts stops with the collectors. We must find out where it goes and to whom it goes. I propose to find out, if possible, so far as it relates to cases in the Magistrates' Courts who it is higher up that is getting it, and I hope that you gentlemen who are cooperating with me in this investigation, no matter how much other work still remains to be done, will direct your energies to this subject, to the end that the true facts in relation to this subject may be disclosed, and we may then determine its relation and bearing upon conditions existing in the Magistrates' Courts."

It is claimed by the defendant that the editorial complained of represented a fair and true report of the matters which had taken place at the public hearing held on February thirteenth, three days before the publication appeared, when it is considered in the light of the testimony adduced and the remarks made by the referee. The jury by its verdict undoubtedly reached the conclusion that the editorial was not libelous in fact. but was fair comment.

The question whether or not the writer of the editorial went beyond the limits of fair criticism in view of what had taken place at the public hearing was one which was properly submitted to the jury. In discussing the general subject of fair comment in *Triggs* v. *Sun Printing & Pub. Assn.* (179 N. Y. 144, at p. 154) Judge MARTIN said: " When a publisher goes beyond the limits of fair criticism, his language passes into the region of libel, and the question whether those limits have been transcended may become a question of law but ordinarily presents a question for the jury." Although the facts in that case did not involve the question of the privilege of newspapers in actions for libel, based upon reports of " any judicial, legislative or other public and official proceedings," which are referred to in section 337 of the Civil Practice Act, still the thought which is expressed by the Court of Appeals through the writer is applicable here.

While we entertained some doubt upon the argument as to the propriety of the refusal by the court to charge at plaintiffs' request, that " the defendants have the burden of proving that the article complained of was justified on the ground of privilege or fair comment," still we have concluded that the ruling was correct. The defendants, it is true, set up the defense of privilege under the provisions of section 337 of the Civil Practice Act. One would naturally reach the conclusion that in so doing they assumed the burden of proof on that question. However, since the editorial as set forth in the complaints indicates upon its face that it dealt with the investigation then in progress, the defendants were not obligated to sustain the burden of proving " that the article complained of was justified on the ground of privilege or fair comment." The point which we have in mind is clearly and distinctly stated by Judge CRANE, in *Hoeppner* v. *Dunkirk Printing Co.* (254 N. Y. 95, at p. 100) as follows: " For the present it makes no difference whether we call this right of criticism, which is free for all, and not the special privilege of the press, a qualified privilege (*Gott* v. *Pulsifer*, 122 Mass. 235), or consider it as no libel (*Van Lonkhuyzen* v. *Daily News Co.*, 203 Mich. 571; *Schwarz Bros. Co.* v. *Evening News Pub. Co.*, 84 N. J. L. 486, 491; *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, 242). The difference in terminology is probably due to the form of pleading. If the public occasion, a matter of public interest, appears upon the face of the complaint, the law of fair comment applies, whereas, if the libelous words (and of course they must be libelous) are alleged in the complaint without the setting or occasion for their utterance, then the fact that they were written as criticism and comment on a matter of public interest must be set forth in the answer as a defense — in the nature of a special privilege. (*Thomas* v. *Bradbury, Agnew & Co., Ltd.*, [1906] 2 K. B. [C. A.] p. 627, at p. 640.) "

Here, we had the public occasion, a matter of public interest appearing on the face of the complaints, and consequently, the law of fair comment applied without the necessity of pleading the special privilege. Since that is so, the burden rested upon the plaintiffs to show that the defendants had gone beyond the bounds of fair criticism.

The point is made by the plaintiffs that the court improperly admitted into evidence articles which appeared in other newspapers prior to the time of the publication of the editorial. Counsel for the plaintiffs based his objection " on the ground that the introduction of a libel from another paper is no excuse for a libel complained of." The trial court, however, correctly said, " It is no excuse if a libel exists, but it is admissible to show what the editor

acted on in writing the editorial." Thus limited, we are of the view that the ruling of the trial court was absolutely correct. (*Palmer* v. *Matthews*, 162 N. Y. 100; *Carpenter* v. *New York Evening Journal Pub. Co.*, 96 App. Div. 376.)

It would serve no useful purpose to discuss the other assignments of error to which our attention has been directed by counsel for the plaintiffs. It is sufficient to say, after a careful examination of this rather voluminous record, that the rulings of the court in the main were correct. We believe that the parties received a fair trial at the hands of the court and the verdict as rendered by the jury in these actions must control.

The judgments should be affirmed, with costs.

TOWNLEY and COHN, JJ., concur; MARTIN, P. J., and UNTERMYER, J., dissent.

UNTERMYER, J. (dissenting). I dissent and vote to reverse the judgment and order a new trial on account of the error of the court in instructing the jury concerning the burden of proof on the issue of fair comment.

No more devastating accusation than that contained in the article could have been devised — no accusation more humiliating to any honest man. Unlike *Hoeppner* v. *Dunkirk Printing Co.* (254 N. Y. 95) and *Briarcliff Lodge Hotel, Inc.*, v. *C-S. Publishers, Inc.* (260 id. 106), the article here did not consist of mere comment but, unless legally justifiable, was libelous *per se*. It was charged that the plaintiffs were " thieves " and " grafters " in that John W. Kenna during several years had collected tribute from persons engaged in commercialized vice. These charges were said to be established by testimony of the plaintiffs in the course of a public investigation into the practices of attorneys in the Magistrates' Courts and the comments of the referee therein.

It was later discovered that a serious mistake had been made and that the deposits by the plaintiffs in their bank accounts were all of honestly acquired funds. The defendants then published a retraction. In their answers they did not undertake to plead justification, but relied on the defense of fair comment, contending at the trial that the article correctly set forth the testimony of the plaintiffs given in the course of a public investigation together with the observations of the referee, and that the imputations of dishonesty were warranted by the facts stated as an honest expression of the defendants' opinion. (See *Foley* v. *Press Publishing Co.*, 226 App. Div. 535, and authorities cited.) The defendants, of course, had the right accurately to report the proceedings in this public investigation, including the testimony given

and the observations of the referee. When, however, they under-took to make a direct charge of dishonorable conduct against the plaintiffs, it was incumbent upon them to establish that the accusation was justified by the facts disclosed.

A consideration of the plaintiffs' testimony in the investigation could not, as it seems to me, warrant the statement in the article that they were " thieves " and " grafters " or the further implication that the plaintiff John W. Kenna was engaged in attempting to " cheat the cheaters," for nothing was established in the investigation except that both plaintiffs had deposited substantial sums of money in their bank accounts. No evidence was given that these funds were derived from any improper source and the most that could be said against the plaintiffs as a result of their testimony was that they were unable, on short notice, to furnish a complete audit of a multitude of transactions covering a period of six years.

However this may be, it was particularly important under the circumstances that the jury should know that even though the defendants had the right correctly to report the facts disclosed during the investigation, the burden of proof rested upon them *also* to satisfy the jury that the charge in the article that the plaintiffs were " thieves " and " grafters " was fairly justified by the facts stated and was, furthermore, an honest expression of the defendants' opinion. The circumstance that the article contained certain facts of public interest which could be the subject of fair comment did not relieve the defendants from the necessity of establishing the other elements without which their defense of fair comment would be incomplete. (*Stuart* v. *Press Publishing Co.*, 83 App. Div. 467.) Instead of placing that burden on the defendants, where it properly belonged, the court in its charge subjected the plaintiffs to the necessity of establishing by a preponderance of the proof that the article was " *not* a fair and true report of the proceedings in question and a fair comment thereon." It refused, over the plaintiffs' exception, the request to charge as follows: " The defendants have the burden of proving that the article complained of was justified on the ground of privilege or fair comment. The burden of proof means that the party having that burden must establish by the fair preponderance of the evidence the subject matter of his defense or of his complaint, and the claim that the article complained of is privileged and is fair comment is a part of the defense in these actions which must be proved by a fair preponderance of the evidence by the defendants." These rulings, which relieved the defendants of the necessity of establishing the defense of fair comment by a preponderance of the proof and

placed upon the plaintiffs the burden of disproving the existence of that defense, was error of so serious and fundamental a character as alone to require the reversal of the judgment. (*Whitlatch* v. *Fidelity & Casualty Co.*, 149 N. Y. 45; *Kay* v. *Metropolitan Street R. Co.*, 163 id. 447; *Heinemann* v. *Heard*, 62 id. 448.)

MARTIN, P. J. (dissenting). I concur in the result reached in the dissenting opinion in this case. It would be a very unwise rule to compel a plaintiff who has been libeled to sustain the burden of proving that the libelous article was not a fair comment on a judicial proceeding. The defense of fair comment must be pleaded and proved and the burden of proof should, at all times, rest with the defendant. (*Smith* v. *New Yorker Staats-Zeitung*, 154 App. Div. 458; *Briarcliff Lodge Hotel, Inc.*, v. *C-S. Publishers, Inc.*, 260 N. Y. 106; *Heinemann* v. *Heard*, 62 id. 448.) While it may be true, as argued, that the result in this case would not have been different if the correct rule had been applied, nevertheless, the burden should be on the defendant, in all such cases, to show that the otherwise libelous article was fair comment.

Judgments affirmed, with costs.