**Linus PAULING, Plaintiff-Appellant,**

v.

**NEWS SYNDICATE COMPANY, Inc.,**
**Defendant-Appellee.**

**No. 301, Docket 28436.**

United States Court of Appeals
Second Circuit.

Argued March 18, 1964.

Decided July 7, 1964.

Eleanor Jackson Piel, Donner & Piel, New York City (Sanford M. Katz, New York City, of counsel), for plaintiff-appellant.

J. Howard Carter, Townley, Updike, Carter & Rodgers, New York City (Andrew L. Hughes, Anson M. Keller, New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge.

Dr. Linus Pauling appeals from a judgment of the District Court for the Southern District of New York dismissing his complaint in an action for libel against the publisher of the New York Daily News after a verdict for the defendant. Federal jurisdiction is founded upon diverse citizenship. The principal claims are (1) error in submission of the defamatory nature of the publication to the jury, (2) the reception of evidence contended to be banned by the hearsay rule and failure to give proper instruction in regard to it, and (3) general unfairness by the trial judge. We affirm.

The alleged libel was an editorial published by the New York Daily News on September 2, 1961, shortly after the announcement of resumption of nuclear tests in the atmosphere by the Soviet Union. The article, which also contained photographs of the two persons named, is set forth in the margin.[1]

1. Two JOHNNY COME-LATELIES

For years, a couple of semi-prominent American loudmouths have been agitating against nuclear weapons and weapon tests —the best defense the West has against Soviet Russian and Chinese Red manpower.

The pair are Linus Pauling, a California biochemist who once won a Nobel Prize, and Norman Cousins, editor of something called the Saturday Review.

Cousins and Pauling now profess to be horrified by Khrushchev's announcement of Soviet resumption of nuclear weapon tests.

But all that Pauling has done about it is to record a plea to his friend in the Kremlin to reconsider.

All that Cousins proposes is that the United States take the matter to the United Nations, in the hope of rallying "world public opinion" (for which

The answer denied that the article was defamatory and also pleaded various defenses, three of which are important on this appeal. A Third Defense alleged that "Insofar as the editorial complained of contains statements of fact relating to plaintiff, such facts are true in substance and in fact and insofar as it consists of comment, such comment is fair comment about such facts and relates to matters of public interest," was published in good faith and without malice toward plaintiff, and expressed defendant's honest opinion. A Fourth Defense asserted that plaintiff, having achieved a good professional reputation in education and scientific research, "became an outspoken advocate of causes, policies, organizations and individuals sympathetic to communism, and he sought wide-spread publicity for such advocacy," thereby creating "for himself a reputation that could not and did not suffer any damage by reason of the editorial complained of." A Sixth Defense set forth that the opinions expressed in the editorial "were based on information communicated to defendant by reliable persons and from reliable sources including prior publications (i) of legislative investigating committees of the United States of America and of the State of California, and (ii) of reputable news media" believed to be true by defendant, which published the editorial in good faith in the ordinary course of business and without malice.

Testimony of Dr. Pauling on direct and cross-examination developed his long and extensive pacifist efforts, including membership in "ten or twenty peace organizations," and, more particularly, his endeavors to stop nuclear testing. These included the submission of a petition by scientists to the United Nations to stop the testing of nuclear bombs in 1958; [2] his initiation in 1958 of an action in the District of Columbia to enjoin the Secretary of Defense and other government officers from testing, regardless of what other nations were doing; his prosecution of this action, see Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960), after unsuccessful efforts to lodge similar actions in Great Britain and the Soviet Union; discussing a test ban agreement with the ambassadors of the United States, Great Britain and the Soviet Union who were engaged in negotiations at Geneva; thereafter publicly stating that the Eisenhower administration was not putting forth its best efforts to obtain a test ban agreement, although making no similar charge with respect to the Soviet Union, and stating also his disappointment that the Kennedy administration during its first few months had not taken any significant action in the direction of a bomb test agreement. When the Soviet Union announced the resumption of nuclear testing in August, 1961, Dr. Pauling sent a letter and a telegram asking Premier Khrushchev to reconsider; he also wrote President Kennedy suggesting "that the United States might be able to refrain from resuming the testing of nuclear weapons, even though the Soviet Government might resume this testing, and that by refraining the United States might not be significantly damaged in a military way and would benefit immensely through the impact of our moral position." This was the background for the editorial.

Khrushchev gives not a damn—he blew a bomb in the air over Asia yesterday) to make the Kremlin forego testing.

It's nice to have these two on the American side for once, however belatedly and lukewarmly.

But their ideas on meeting the Khrushchev threat are no better than their long-standing proposals that the West cripple itself.

Far preferable in the present situation is the flat statement of Dr. Edward Teller, father of the H-bomb: that the United States cannot survive unless it resumes its own nuclear weapon tests at once.

2. The petition urged "that an international agreement to stop the testing of nuclear bombs be made now." The News stressed there was no mention of inspection; Dr. Pauling contended this was implicit in the reference to an international agreement.

■■■ (1) Judge Dawson told the jury that the first issue of fact it must decide was whether the editorial imputed "that Dr. Pauling is either disloyal or a Communist, or a Communist sympathizer." He said that "To accuse a man of being a traitor to his country, or of being a Communist or pro-Communist, is, of course, libelous," and that Dr. Pauling contended this was what the article meant. He then explained the News' contention that the article meant only that the policy of the United States had been to have nuclear weapons and weapon tests so long as there was no international agreement with adequate safeguards, and that as to this Dr. Pauling had not been "on the American side." Such an accusation, the judge charged, would not be libelous. The jury must thus determine whether the editorial "would convey to the ordinary man that Dr. Pauling had been a traitor to the United States, or was pro-Communist or anti-American, or whether it indicated, on the contrary, that he had merely expressed a view different from that of the particular government in power at that time."

We find nothing wrong with this charge. It is true that "If the language of a publication is unambiguous the question whether it is libelous per se is for the court" and that "it is libelous under New York law to write of a lawyer that he has acted as agent of the communist party and is a believer in its aims and methods," Wright v. Farm Journal, Inc., 158 F.2d 976, 978 (2 Cir. 1947). But the editorial here did not unambiguously accuse Dr. Pauling of being a Communist or pro-Communist or disloyal, although it could be so understood. The passages particularly relied on by the plaintiff are the reference to Premier Khrushchev as Dr. Pauling's "friend in the Kremlin" and the statement about now having Dr. Pauling "on the American side for once." But these must be read against the editorial's opening sentence truthfully stating that Dr. Pauling had long been "agitating against nuclear weapons and weapon tests" which the writer regarded as "the best defense the West has against Soviet Russian and Chinese Red manpower." The statements could carry at least two interpretations which were not defamatory: one that Dr. Pauling's public agitations, although not motivated by disloyalty, had unwittingly resulted in helping the Russian cause and harming the American; the other, even more innocuous, that Dr. Pauling was Khrushchev's "friend" in the sense that their opinions were often in agreement and that he was "on the American side for once" in that his views had usually been opposed to the official American Government position on disputed questions. The case was thus one where, under New York law, a jury might find the editorial defamatory, Sweeney v. United Feature Syndicate, Inc., 129 F.2d 904 (2 Cir. 1942); Grant v. Reader's Digest Ass'n, 151 F.2d 733 (2 Cir. 1945), cert. denied, 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1946); Mencher v. Chesley, 297 N.Y. 94, 75 N.E.2d 257 (1947); Toomey v. Farley, 2 N.Y.2d 71, 78, 156 N.Y.S. 2d 840, 845, 138 N.E.2d 221 (1956),— not one where the judge ought instruct that it was. Save when words are necessarily defamatory, "It is for the court in the first instance to determine whether the words are reasonably capable of a particular interpretation; it is then for the jury to say whether they were in fact so understood," Prosser, Torts 581 (1955); 1 Harper & James, The Law of Torts 463–64 (1956).[3]

3. The brief of Dr. Pauling's appellate counsel points to another possibly defamatory feature of the editorial, namely, the statement that Dr. Pauling "now profess[es] to be horrified" by the announced Soviet resumption of nuclear testing. This is claimed to be a charge of insincerity that would be actionable in itself, as well as to give added color to the reading that Dr. Pauling was working on behalf of the Soviet Union. But, although "profess" often carries the implication of insincerity, it does not inevitably do so; insofar as this sentence may have given added weight to the argument that the editorial charged Dr. Pauling with being pro-Communist, it was before the jury along with everything else; and the judge

 (2) Despite its position that the editorial did not in fact accuse Dr. Pauling of being a Communist or a pro-Communist, the News had to recognize that the jury might think otherwise. It could defend against that possibility by proving the truth of the allegedly defamatory statement. In support of the defense of truth the News brought out on cross-examination of Dr. Pauling a considerable number of items from which the jury could draw the inference that he was in fact a Communist sympathizer; from the News' standpoint it was important that this be done in some detail since the accumulation of instances might support an inference unwarranted from any one. The major portion of the trial was therefore devoted to questions intended to bring out Dr. Pauling's past association with Communist sympathizers and activities.[4]

The News was not required however to stake everything on the jury's accepting the defense of truth; it could fall back on its Third Defense of fair comment, and upon partial defenses including matters going to the extent of the damage and, under a New York statute, "mitigating circumstances, including the sources of * * * information and the grounds for * * * belief."[5] An extra-judicial assertion which the hearsay rule would bar as proof of the matter asserted may be admissible to establish one or more of these defenses on the basis that it is being "offered, not as an assertion to evidence the matter asserted, *but without reference to the truth of the matter asserted*,"—in other words, that the fact of the offered utterance is relevant in and of itself, regardless of its truth. See 6 Wigmore, Evidence, § 1766 (3d ed. 1940); McCormick, Evidence, 463 (1954); Morgan, A Suggested Classification of Utterances Admissible as Res. Gestae, 31 Yale L.J. 229, 231–32 (1922); Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62. Harv.L.Rev. 177, 199 (1948).

 The privilege of "fair comment," the so-called "rolled up" plea,. Gatley, Libel and Slander, 477–78 (1960 ed.), is defined in A.L.I. Restatement, Torts, § 606, as follows:

"(1) Criticism of so much of another's activities as are matters. of public concern is privileged if the criticism, although defamatory,.

"(a) is upon,

"(i) a true or privileged statement of fact, or

"(ii) upon facts otherwise known or available to the re-

---

was not asked to charge that the jury might find the editorial defamatory in alleging hypocrisy *simpliciter*. To the contrary, plaintiff's trial counsel told the jury in summation, in words which the judge quoted, "I say to you if you cannot infer, or if you cannot understand that editorial to impute that Dr. Pauling is either disloyal or that he is a Communist, or a Communist sympathizer, then there is nothing to this case."

4. Dr. Pauling's admissions included, among other things, that he had frequently intervened publicly on behalf of Communists or pro-Communists—the defendants in United States v. Dennis, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, their lawyers when cited for contempt, Julius and Ethel Rosenberg, Morton Sobell, the "Hollywood Ten" contempt defendants—and the Communist Party itself, sometimes at his own instance or on that of friends and sometimes at the instance of Communist or Communist front organizations; that. he had chaired a committee to welcome the "Red Dean" of Canterbury in Los: Angeles; that he had advocated repeal of the Smith Act; that he had belonged to organizations later classified as subversive by the Attorney General or the House Un-American Activities Committee; and that he had paid for an advertisement that a Senate Subcommittee investigating his affiliations with Communist front organizations was a disgrace to Congress, the nation and the American people.

5. The News' brief cites this as § 78 of the Civil Rights Law, McKinney's Consol. Laws, c. 6, which became effective only September 1, 1963. However, similar provisions of Civil Practice Act, §§ 338 and 339, were in effect at the time of the alleged libel and of the trial. For convenience we shall refer to the existing. statute.

cipient as a member of the public, and

"(b) represents the actual opinion of the critic, and

"(c) is not made solely for the purpose of causing harm to the other."

Reports of Dr. Pauling's activities which the hearsay rule would render inadmissible to prove truth might be admissible for various purposes with respect to this defense. One would be to show that the comment was upon a "privileged statement of fact"; [6] on this basis it was proper for the News to introduce reports of legislative and executive proceedings to show the "privileged facts" that formed a basis for its comment. If the News relied on such reports, these would also be admissible, again regardless of their truth, to show that the comment was "not made solely for the purpose of causing harm," in other words to negative "malice."

A still broader basis for the admission of evidence which was inadmissible as hearsay on the defense of truth is suggested by the point, apparently asserted by the News' Fourth Defense, that so many people already considered Dr. Pauling a Communist sympathizer that for the News to call him one would cause no more than nominal damage. Hence, the argument runs, evidence of previous reports freely circulated about the victim of the libel are admissible, regardless of their truth, to

show how he was generally considered. We are not required to decide whether, as a matter of common law, New York would follow the majority in Bell v. Parke, 11 Ir.C.L. 413 (1860), in excluding such evidence, see 1 Wigmore, Evidence (3d ed.), § 79—on the ground that despite the strict logic favoring admission, the danger of confusion is too great—but see King v. Root, 4 Wend. 113, 114, 139–140, 158; Hamer v. McFarlin, 4 Denio, 509 (1847), or whether, even if so, the evidence might still be admissible under F.R.Civ.Proc. 43(a), at least where it took the form of official reports as distinguished from mere gossip. See Hope v. Hearst Consol. Publications, Inc., 294 F.2d 681 (2 Cir. 1961), cert. denied, 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388 (1962). For evidence that the News relied on statements from federal executive departments and Congressional committees about Dr. Pauling's activities would surely qualify under the Sixth Defense as "mitigating circumstances, including the sources of * * * information and the grounds for * * * belief .* * *." under § 78 of the New York Civil Rights Law. Danziger v. Hearst Corp., 304 N.Y. 244, 107 N.E.2d 62 (1952) [testimony in court proceeding]; Kenna v. Daily Mirror, Inc., 250 App.Div. 625, 629, 295 N.Y.S. 219, 224 (1st Dept.), aff'd, 276 N.Y. 483, 12 N.E.2d 168 (1937) [articles in other newspapers].

We are now ready to consider the first episode. The News was allowed

---

6. 1 Harper & James, The Law of Torts 458–59 (1956), explains that in the usual case the defense of fair comment exists only as to the criticism and not as to the facts themselves, and that the latter must be "truly stated or *privileged* or otherwise known either because the facts are of common knowledge or because, though perhaps unknown to a particular recipient of the communication, they are readily accessible to him." Although the cases cited do not throw light on what is meant by "privileged facts," the thought must be that if publication of the "facts" themselves would not be actionable because protected by a privilege, such as the privilege for reports of legislative and executive proceedings, ALI Restatement, Torts,

§ 611; Cresson v. Louisville Courier-Journal, 299 F. 487 (6 Cir. 1924), current or subsequent comment based on such "facts" is also protected. See Gatley, Libel and Slander, 335–36, and Mangena v. Wright, [1909] 2 K.B. 958, 976–77. Thus, as applied to this case, the News would have been privileged to call Dr. Pauling a Communist sympathizer in commenting on the statement of facts in the Report of the Senate Subcommittee in March, 1961, referred to below, and also to use that statement as a basis for making the same accusation apropos of his letters and telegram in September. It was thus permissible for the News to show for this purpose what the statement was.

to bring out on cross-examination of Dr. Pauling that twice in 1952 the State Department rejected his application for a passport; that on one of these occasions Dr. Pauling issued a statement to the press that "The action of the State Department was based on suspicion that I was a Communist and because anti-Communist statements by me have not been sufficiently strong"; and that this was what Dr. Pauling believed. There was no objection to any of this as hearsay; counsel objected to the question on rejection as "too far afield," made no objection to the question as to the press statement, and objected to the question of Dr. Pauling's belief without saying why. The action of the State Department in rejecting a passport application, which would normally be granted as a matter of course, was admissible to show that the editorial was an opinion based on a "privileged fact," to negative malice, and to show mitigating circumstances under § 78 of the New York Civil Rights Law. Since a statement of grounds by the Department would have been similarly admissible, it would be straining at the gnat to take a different view with respect to a public attribution of grounds by Dr. Pauling himself. Whether Dr. Pauling believed in the truth of his press statement was indeed irrelevant, but allowing him to say that he did was not prejudicial if there was no error in what had gone before. A possible chink in defendant's armor is the lack of particularized evidence that Maury, the author of the editorial, knew of this episode when he wrote the editorial. Maury testified [7] that, before writing, he "got the clippings on Pauling, sort of ran through them to refresh my memory, which was pretty clear on him, anyway," and that "our library files contain everything that comes along about any subject that it has files on." In the absence of any evidence to the contrary, these general statements warranted the conclusion that Maury was informed of the facts. At least this was so when the objection was so vague as to give defendant no clue that any deficiency could be cured by a question to Maury. 1 Wigmore, Evidence, § 18, pp. 321–22, 332–38; McCormick, Evidence, 117–18. There was thus no error in receiving this evidence; whether there was error in failing to instruct the jury as to the issues on which it could be considered will be discussed below.

The next piece of cross-examination now contended to have violated the hearsay rule consists of two questions asking Dr. Pauling whether statements had been published in the press and made "in the Halls of Congress" that he had followed the Communist Party line, which he answered in the affirmative. It is sufficient at this point to say that no objection to these questions was made.

 Passing instances where Dr. Pauling was asked whether he knew that various organizations with which he had been connected had been found subversive by the Un-American Activities Committee or the Attorney General, which were admissible as a basis of fair comment, we arrive at a subject of more extended complaint. Defense counsel had marked for identification a Report to the Senate Committee on the Judiciary by its Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws, entitled "Testimony of Dr. Linus Pauling, June 21 and October 11, 1960." After eliciting that Dr. Pauling had been subpoenaed to appear before the Subcommittee,[8] defense counsel, without objection,

7. Maury was called by the plaintiff and was examined only by him.

8. The Subcommittee Report recited Dr. Pauling's unsuccessful efforts, between his two appearances, to have the subpoena quashed, see Pauling v. Eastland, 109 U.S.App.D.C. 342, 288 F.2d 126, cert. denied, 364 U.S. 900, 81 S.Ct. 233, 5 L.

Ed.2d 194 (1960). It challenged Dr. Pauling's assertions that the Subcommittee was investigating his views on nuclear testing, asserted the investigation was needed to determine whether the right of petition was in fact being utilized by or in the interest of the world Communist movement, and recommended the study of

brought out that some newspapers had published the Subcommittee's report. He then asked: "Q. Did this Senate Committee conclude that in your statements and your attitudes before the Committee you had displayed a consistent pro-Soviet bias?", to which plaintiff's counsel objected as "hearsay and conclusion." When the judge ruled, "Well, he is asking this witness. He is not putting in this report. He is asking this witness if that is the conclusion," Dr. Pauling answered that the conclusion was one with which he disagreed. Then, after some further interchange, defense counsel propounded a series of questions, of which the following is typical:

"Q. Now, based upon the Subcommittee's interrogation of you, did it conclude that you in the course of your career had been connected with various pro-Communist or Communist front political activities and with a significant number of persons whose affiliations with the Communist Party U. S. A. are a matter of record?"

Upon objection that this was "hearsay" and "conclusion," the court permitted the witness to "answer whether they said that and whether he says this is one of the false statements. If he says it is a false statement, it is a false statement." Dr. Pauling admitted that the

Subcommittee Report had made statements substantially as characterized by defense counsel but denied their truth.[9] Maury testified that he had read the Subcommittee report when it was released in March, 1961, and that he "may have looked at it" again before writing the editorial but in any event "I was familiar with it. I knew the whole substance of the thing."

Our previous discussion has shown that the Subcommittee Report itself would have been admissible for a number of purposes. We do not understand why defense counsel chose to get it before the jury in the way he did rather than by offering it or reading from it, but that is not our concern if plaintiff was not prejudiced thereby. Since the terms of the Report were at issue, the best evidence rule entitled plaintiff to object to oral testimony as to its contents and to insist that the report itself be offered; but plaintiff's trial counsel refrained from pressing that point, wisely, we think, since the report itself would have been immensely more damaging than the few questions asked about it. We have examined the Report to see whether the questions propounded were an unfair paraphrase; we find them to have been almost a literal transcription from two of the Subcommittee's eleven unfavorable conclusions.[10]

legislation to make that "more difficult." Whatever views may be held with respect to such investigations, see United States v. Welden, 84 S.Ct. 1082 (1964) (dissenting opinion of Mr. Justice Douglas), the report was regular and carried the usual privilege even though it was unusual in being aimed at the activities of one person.

9. On another occasion, when Dr. Pauling was asked whether the Subcommittee found that he "had consistently opposed legislation and agencies set up by the American Government to safeguard itself against Communist subversion," his trial counsel, after repeating his previous objection, noted, apparently to fortify this, that defense counsel was reading from the Subcommittee Report. Later Dr. Pauling was asked whether the Committee had found "that you over the past decade played a role of outstanding im-

portance as an organizer and spokesman in the United States for organizations recognized as part of the Communist peace offensive and that in recent years you had concentrated your efforts in the test ban field?" The Court overruled an objection that this was hearsay, stating "The only question is whether Dr. Pauling recognizes the Committee said that about him, not whether it is true or not."

10. Others of these were:
"(1) The vague and general wording of Dr. Pauling's petition [in 1958 to the United Nations], in particular the omission of any reference to the need for adequate inspection (at a time when the Kremlin was opposed to even token inspection) made it acceptable to the Soviet Government and therefore to Soviet scientists. It bore a marked similarity to the wording of the test-ban petitions

To be sure, it was scarcely relevant whether Dr. Pauling knew what the Subcommittee had said, but if defendant chose to prove the Subcommittee's statements by the oral testimony of a reader of the report, we find no ground for reversing on that account when no objection under the best evidence rule was made—particularly when it is so plain that proceeding in this manner caused no prejudice.

■ We thus come to the serious issue in the case—whether it was reversible error for the judge not to have given specific instructions as to the limited purpose for which the jury might utilize the evidence just reviewed. We note preliminarily that the burden of seeing to it that a proper limitation is placed on the use of utterances banned by the hearsay rule as proof of the facts stated but admissible for narrower purposes, falls on the opponent of the evidence. See 1 Wigmore, supra, § 13; Malatkofski v. United States, 179 F.2d 905, 914 (1 Cir. 1950); United States v. Smith, 283 F.2d 760, 764 (2 Cir. 1960), cert. denied, 365 U.S. 851, 81 S.Ct. 815, 5 L.Ed.2d 815 (1961); United States v. Mont, 306 F.2d 412, 415–416 (2 Cir.), cert. denied, 371 U.S. 935, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962); Case v. New York Central R.R., 329 F.2d 936 (2 Cir. 1964); Lieberman v. Gulf Oil Corp., 331 F.2d 160, 164–165 (2 Cir. 1964).

Both parties had submitted written requests for instructions. When the taking of testimony ended, the judge expressly, and properly, denied a request by the plaintiff for a binding instruction that the editorial was defamatory. He denied the other requests of both sides "in the form stated because in certain respects they are argumentative; in other respects they are not complete," but said he would use them in preparing

his charge. In dealing with the defense of fair comment he called the jury's attention to Maury's testimony "that he relied on the hearings before, and the report of, a Senate Sub-committee on Internal Affairs, and on various newspaper clippings in his possession when the editorial was written." He said also that the defendant might resist or minimize a claim for punitive damages by showing "that in writing the editorial he did so in good faith, relying on certain matters which had come to his attention * * *" He did not say that the defense of truth could not be sustained by evidence that would be hearsay for that purpose although he in no way intimated that it could.

At the conclusion of his charge, the judge asked whether there were any exceptions. One of plaintiff's trial counsel sought various amplifications, several of which the court made. Counsel then said "We have no exceptions because the Court has remarked on what he thought," repeated "We have no exception," and asked whether the exhibits would go to the jury, which the judge confirmed. Defendant says that under F.R.Civ.Proc. 51 this ends the matter. Plaintiff's contrary contention rests on (a) his requests to charge and (b) an alleged denial of opportunity to take exceptions.

■ (a) One of plaintiff's requested instructions, No. 6, was that the court had permitted the introduction of hearsay testimony, "in other words, testimony which consists of rumors or information conveyed to the officers of the defendant corporation" and that such testimony "was not admitted as evidence of truth of the defendant's libelous publication, but was admitted for the sole and only purpose of establishing on the part of the defendant good or bad faith,

put out by the Communists through their creature organization, the World Peace Congress."
"(4) Communist interest in and exploitation of Dr. Pauling's petition constituted a phase of the Kremlin's fraudulent 'peace' offensive."

"(6) * * * He has participated in many international organizations and international conferences sponsored by the Communist peace offensive * * * In his statements and attitude Dr. Pauling has displayed a consistent pro-Soviet bias."

malice or the lack of it." Another, No. 19, relating to the defense of truth, included a statement "that the defendant cannot establish the truth by hearsay testimony, nor can it establish the truth by rumor, nor by the testimony of its agents and publishers that they believed the truth of the libelous publication when it was published."

Requested instruction No. 6 suffered from the vice of overstatement usual in such requests. The word "rumors" was grossly inappropriate; moreover, and more important, the instruction made no allowance for the admissibility of this "hearsay" to prove that defendant's comments were based on statements of fact within a privilege, see fn. 6, and would scarcely have conveyed the permissible use of the evidence to prove a partial defense in mitigation of damages under § 78 of the New York Civil Rights Law. On the other hand, the request quoted from Instruction No. 19 was substantially correct.

We see no reason to doubt that if the point had been called to Judge Dawson's attention by a timely objection, he would have supplemented his charge accordingly. The case is not like the decisions in this circuit, relied on by appellant, where the judge, having focussed on the point, charged the opposite of what had been requested, so that objection would have been a useless formality. Sweeney v. United Feature Syndicate, Inc., 129 F.2d 904 (2 Cir. 1942); Wright v. Farm Journal, Inc., 158 F.2d 976, 978 (2 Cir. 1947) [supplemental request after charge]; Keen v. Overseas Tankship Corp., 194 F.2d 515, 518–519 (2 Cir.), cert. denied, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363 (1952). Here the judge had referred to the challenged evidence only in connection with issues as to which it was properly receivable; the defect was solely of omission. Judge Dawson had been entirely receptive to plaintiff's other requests for supplementary instructions; on counsel's objection, he further charged the jury that in figuring damages they should take account of the News' wide circulation, that malice could

be established by circumstantial evidence, that an unsuccessful plea of truth could tend to support a finding of malice, that the law presumes a person's reputation to be good, and that in deciding whether an article is libelous they must consider it as a whole and in its effect on a person of ordinary understanding. When we add to the reiterated "We have no exceptions" counsel's commendation of the charge as "lengthy and thorough" and "a very good job," and the judge's request for specific exceptions, expressly stating "I am not going to review all your requests to charge," we conclude that the judge's attention was not adequately called to the omission now urged. Indeed, the case is less favorable to plaintiff than Rosenfeld v. Curtis Publishing Co., 163 F.2d 660 (2 Cir. 1947), where Judge Clark, surely no stickler for formalism, considered that not enough had been done to warrant reversal for a new trial.

We are the more inclined to this view in that the "hearsay" evidence to which objection had been made, some eight or nine questions in a four-day trial with nearly 500 pages of testimony, had not played a role anything like so impressive as that which appellate counsel, with entire propriety, has assigned on appeal or as would be indicated by the attention to it in this opinion. Defense counsel did not even refer to these questions and answers in his summation, which was devoted rather to the allegedly non-defamatory character of the article as applied to activities which Dr. Pauling had admitted. Plaintiff's counsel might well have thought it better trial tactics to let a sleeping dog lie rather than to press a request that the jury be told the purposes for which the report of the Senate Subcommittee could not be considered and thereby precipitate a request by the News that the judge impress upon the jury the important purposes for which it could be.

▮▮▮▮ (b) The contention that the judge prevented the taking of full exceptions to his charge rests on an affidavit in support of a motion for a new

trial by one of the two lawyers who were plaintiff's trial counsel—not the one who had spoken at the conclusion of the charge. The claim was that since both lawyers came from another state, they were unfamiliar with local practice as to when and how exceptions to the charge should be taken; that, upon inquiry in chambers, Judge Dawson told them that "minor exceptions" could be taken in the presence of the jury but that "general exceptions for the record" should then be taken out of the presence of the jury; that the objections made at the conclusion of the charge were only those "we could reasonably expect that the Court would alter or add to the charge"; [11] and that as soon as the jury filed out, the affiant requested an opportunity to take further exceptions, which the judge refused on the basis of the previous statement of his associate. In denying the motion Judge Dawson filed a memorandum which characterized this claim as "completely false." The memorandum stated that the request for permission to take further exceptions to the charge was not made until after the jury was in the jury room and the court reporter had left, and while defense counsel was leaving; and that the court then pointed out that exceptions must be taken before the jury begins its deliberations, so that if the exceptions were proper, the court could correct its charge.

F.R.Civ.Proc. 51 states, with complete clarity and good sense, that objections to instructions must be made "before the jury retires to consider its verdict." See O'Connell v. Naess, 176 F.2d 138, 140 (2 Cir. 1949). Although there may be differences in practice among districts, or among judges in the same district, whether objections should be made within or without the hearing of the jury, any procedure for deferring the making of objections until after the jury has begun its deliberations would be so wholly contrary to the language and spirit of the Rule that we cannot believe it is followed in any district, and surely cannot imagine that Judge Dawson in any way countenanced this. Insofar as the argument has any merit, it must rather be on the basis that the judge should have postponed the beginning of the jury's deliberations until a second series of objections could be made. But the judge was justified in thinking there was no intention to make any. As we have stated, after making various objections quite as important as those now claimed to have been reserved, associate trial counsel twice recited there were no more, and indicated, by his remark as to the exhibits, that he expected the jury to begin its deliberations without delay. Then came the excusing of the alternate jurors, the swearing of the marshals, and a statement by the court "The jury may retire under the escort of the marshals to the jury room. I will be in court awaiting your verdict"—all without the slightest effort to make the further "general" exceptions which the judge had said should be made outside the presence of the jury but certainly not after the jury began to deliberate. Although it would not have been error for him to tell the jury to postpone its deliberations, and recall the court reporter and defense counsel, he was not required to do so.[12]

11. As indicated, we see no reason why the requests here under discussion did not come within this description. The only request the judge had expressly refused was to instruct that the article was defamatory.

12. What we have written in regard to the failure to give express instructions that the "hearsay" evidence that had been admitted could not be used to support the defense of truth, applies *a fortiori* to the contention that we ought reverse for failure of the judge to give an express instruction that the News had the burden of proving the defense of fair comment. The judge twice spoke of the defendant's having to "establish" this defense. Moreover, there is New York authority that where, as here, the "public occasion" is evident, the plaintiff has the burden of showing that the defendant went beyond proper bounds. Kenna v. Daily Mirror, Inc., 250 App.Div. 625, 295 N.Y.S. 219 (1st Dept.), aff'd, 276 N.Y. 483, 12 N.E. 2d 168 (1937).

(3) We have given careful consideration to the claim of unfairness on the part of the trial judge. It is difficult for an appellate court to appraise the significance of remarks that may look quite different in a cold record than when made in the give and take of a trial. Although some comments would better have been foregone, the record is far from manifesting such unfairness as to warrant our ordering a new trial after a balanced charge and an afternoon's deliberation by the jury.

If we took a different view on the matters here reviewed, it might be necessary to consider whether the judgment would not have to be affirmed in any event in the light of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We realize that the sole point actually determined by that decision was that the First Amendment requires a state to recognize a "privilege for criticism of official conduct," 376 U.S. at 282, 84 S.Ct. at 727, extending to misstatements of fact, this being regarded as in some way the reciprocal of the privilege of federal officials against liability for defamatory statements "within the outer perimeter" of their duties. See Barr v. Matteo, 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Although the public official is the strongest case for the constitutional compulsion of such a privilege, it is questionable whether in principle the decision can be so limited. A candidate for public office would seem an inevitable candidate for extension; if a newspaper cannot constitutionally be held for defamation when it states without malice, but cannot prove, that an incumbent seeking re-election has accepted a bribe, it seems hard to justify holding it liable for further stating that the bribe was offered by his opponent. Once that extension was made, the participant in public debate on an issue of grave public concern would be next in line; thus, as applied to the case in hand, if a newspaper could not be held for printing Dr. Pauling's charges that a member of the Atomic Energy Commission had "made dis-honest, untrue and misleading statements to mislead the American people" and that a United States Senator is "the greatest enemy * * * the United States has," as the New York Times case decided, one may wonder whether there would be sound basis for forcing it to risk a jury's determination that it was only engaging in fair criticism rather than misstating facts if it printed, falsely but without malice, that in saying all this Dr. Pauling was following the Communist line. The "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," now applied to confer immunity on "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," 376 U.S. at 270, 84 S.Ct. at 721, may some day be found to demand still further erosion of the protection heretofore given by the law of defamation. It suffices for our decision here that Dr. Pauling's case was properly submitted to the jury under pre-New York Times law.

Affirmed.