Cleo Francis HUGHES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 7192.

United States Court of Appeals Tenth Circuit.

July 26, 1963.

Rehearing Denied Aug. 15, 1963.

Joseph C. Ryan (of Seligman & Ryan), Albuquerque, N. M., for appellant.

Lewis O. Campbell, Asst. U. S. Atty., Albuquerque, N. M. (John Quinn, U. S. Atty., Albuquerque, N. M., on the brief), for appellee.

Before PHILLIPS, PICKETT and SETH, Circuit Judges.

PICKETT, Circuit Judge.

The defendant, Hughes, appeals from a conviction on an 8-count indictment charging him with using the mails for the delivery of nonmailable matter, in violation of 18 U.S.C. §§ 1718, 1461, and 1463.[1] This appeal presents the questions of the sufficiency of the evidence to sustain the verdict; error in the admission of evidence of crimes or acts other than those set forth in the indictment; and prejudicial examination of an expert witness by the court.

■■ At the conclusion of the prosecution's case, the court denied a motion for a judgment of acquittal. The defendant then offered evidence in his own defense, and the motion was not renewed at the conclusion of all of the evidence. We have repeatedly held that if, after the denial of a motion for acquittal or for a directed verdict, a defendant presents evidence in defense of the charge, he waives any objection he may have had to the denial of the motion. In the absence of a motion for a judgment of acquittal at the close of all of the evidence, federal appellate courts will not pass upon the sufficiency of the evidence to support the verdict. Corbin v. United States, 10 Cir., 253 F.2d 646; Johns v. United States, 10 Cir., 227 F.2d 374.

■ In view of the insistence that the evidence is insufficient to sustain the verdict, and the statement of defendant's counsel in oral argument that the conviction is a miscarriage of justice, we, regardless of procedural deficiencies, reviewed the evidence in detail and have concluded that the verdict and the judgment and sentence thereon have ample support in the evidence. Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution, as we must,[2] it reveals that over a period of years there had been a very close association between the defendant and his wife with William J. Slusser and his wife, Ora, and their four minor children. The Slusser children spent considerable time in the Hughes' home, and were taken on numerous trips by them over a period of years. The Hughes insisted that they loved the children to the same extent as though they were their own, and continuously lavished attention and expensive gifts upon them. They seemed to be particularly fond of a 13 year old daughter. In 1960 they took Mrs. Slusser and her daughter on a three weeks' trip to Florida. Early in 1961 the Slussers concluded that it would be to the best interest of the children to put a stop to this relationship, or at least to curtail it. Hughes was indignant when told of this and for a considerable time thereafter he continuously harassed Mrs. Slusser with numerous telephone calls. At first these calls were friendly, but later his statements became abusive. The telephone calls continued until the Slussers obtained an unlisted number. In a conversation Hughes told Mrs. Slusser that he would make her sorry of the day they met, and would make her children sorry of the day that she was their mother.[3] During this conversation, he

---

1. 18 U.S.C. § 1463 declares matters which are otherwise mailable to be nonmailable if the envelope or outside cover or wrapper and all postal cards display indecedent, lewd, lascivious or obscene printed matter or characters.

   18 U.S.C. § 1461 prohibits the use of the mails for the delivery of obscene, lewd, lascivious, indecent, filthy or vile matters.

   18 U.S.C. § 1718 applies to libelous, scurrilous, defamatory or threatening language or characters upon envelopes, out-side wrappers or postcards deposited for mailing in the United States mails.

2. Sandoval v. United States, 10 Cir., 285 F.2d 605, and cases cited.

3. In describing the conversation, Mrs. Slusser testified:

   "A. I went to the doctor, had my appointment with Dr. Bass and when I came out of the office and I started to get into the pickup, my husband was gone at the time and I started to get into the pickup, and I think I got in the pickup, Mr. Hughes from there behind and from there

also displayed a "mimeographed letter" to Mrs. Slusser, telling her that he had 20 to 25 of these prepared and that she would receive the first letter the next day. Shortly thereafter printed material came through the mail addressed and delivered to the Slussers which was exceedingly filthy, vile and lascivious. During the same period similar material was found in the mail boxes or at the homes of a number of friends, neighbors and relatives of the Slussers. This material was all reproduced by a machine which was referred to in the evidence as a "Ditto" machine. A typewritten, obscene letter was left at a school for delivery to the daughter.

■ The reproduced material was all prepared by the same kind of a machine, and Mrs. Slusser testified that it was of the same type as that which had been shown to her by Hughes during their conversation. Hughes was employed in an office where he used a Ditto machine that reproduced typewritten material similar to that received in the mail and distributed in the Slusser's neighborhood. This material was also similar to an exhibit which Hughes admitted he had prepared on the Ditto machine in connection with another matter. Throughout the exhibits there was a tendency to misspell certain words. In a known writing which Hughes prepared for a postal inspector this tendency existed as to these words. After the investigation and interview of Hughes by the postal inspector, no more such material was received through the mail or distributed in the area where the Slussers lived. Although much of the evidence is circumstantial, it appears that it would have been difficult for a jury to arrive at any other verdict than it did.

■ The appellant contends that the trial court erred in admitting into evidence the obscene material found by neighbors and relatives of the Slussers which was not identified with the charges in the indictment. This material was circulated during the period that similar material was sent to the Slussers through the mail. Considering the circulation of the obscene material to be a crime, this does not necessarily make it inadmissible in this case. Proof of other crimes is not ordinarily admissible in the

across the street, and he came over to the pickup.

"Q. Is that this defendant? A. Yes, sir. He tried to grab the keys and I wouldn't let him have them. I kept them in my hand and I asked him to leave me alone. He said, 'You have messed up my whole life taking Linda and those children away from me.' I said, 'You couldn't have loved those children or you wouldn't want to hurt them like you have by acting—'

"Q. Just say what you told him. A. I said, 'You couldn't have loved them or you wouldn't have hurt them.' He said, 'if you think I have done anything yet, what I have done to you.' He handed me a mimeographed letter. He said, 'Read this.' He said, 'I had from twenty to twenty-five of these prepared,' and he said, 'If you go in there the next time and that doctor and the nurses look at you funny' he said, 'you will know the reason why,' and he said, 'If your neighbors stop speaking to you, you will know the reason why.' He said, 'I have church council tonight and you will receive that first letter tomorrow morning—'

"Q. Just a minute. When he handed you this letter, did you attempt to read it? A. Yes, sir, I read it and I tried to keep it and he tore it away from me.

"Q. What, if anything, did he say about the contents of that letter? A. The contents were—

"Q. What did he say about the contents? A. He didn't say anything other than, 'You think that is bad.' He said, 'Read this.'

"Q. Did he use the word 'bad'? A. Yes, sir.

"Q. Do you know the difference between mimeograph and ditto machine? A. No, sir, only it is ink.

"Q. Take a look at Government's Exhibit 26–F. Do you see the process by which that was prepared? A. Yes, sir.

"Q. State whether or not it is the same type of process. A. It was the same type as this.

"Q. Was there any conversation at that time about your children, how they might feel about you? * * *

"A. No, sir, other than the fact, he said that I had ruined his life by taking Linda and the children away from him and he said if I thought he had hurt them already he had not begun yet, and he also said he had letters proving Bill and I had threatened his life."

trial of a criminal case, but such evidence may be admissible to prove "intent, design, and system," Lisenba v. California, 314 U.S. 219, 227, 62 S.Ct. 280, 86 L.Ed. 166; "a continuing course of conduct," Doty v. United States, 10 Cir., 261 F.2d 10, 13; "guilty knowledge, intent, design or mental predisposition," Harbold v. United States, 10 Cir., 255 F.2d 202, 204; "intent * * * course of conduct, or. * * * the crime charged," Jones v. United States, 10 Cir., 251 F.2d 288, 294, cert. den. 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715; or "capacity, habit, plan, knowledge, intent, motive, or identity", United States v. Frascone, 2 Cir., 299 F.2d 824, 828, cert. den. 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404. The evidence in this instance was admissible to establish a course of conduct and to identify the defendant.[4]

■ Finally, it is contended that the court erred in its questioning of a psychiatrist who was called by the defendant to testify as to the mental competency of Hughes. It is urged that the court's questioning tended to adduce answers from the witness to the effect that Hughes had written and distributed the material. Some of the court's questions, taken out of context, might so indicate, but the entire examination of the psychiatrist, whether by his own counsel or by the court, was on the assumption, but not the admission, that Hughes had committed the acts complained of. Hughes denied any connection or knowledge of the distribution of the obscene material. When the defense of insanity was interposed, it was necessary for the psychiatrist to assume that he had committed the crime in arriving at his conclusion or opinion. This is all the court did when its questions were propounded, and they were not prejudicial. We find no merit in the assertion that the conduct of the trial judge throughout the trial displayed a prejudice against the defendant.

Affirmed.

4. The court instructed the jury on this subject as follows:

"During the trial of this case certain material, circulated in the vicinity of the Slusser home, was introduced in evidence, which was not mentioned or referred to in the indictment returned by the grand jury, and was not sent through the United States Mails. You are instructed that those writings not mentioned in the indictment may, where permitted to go to you, be considered by you for the limited purpose of making comparisons of the spelling, phrasing, and similarities, diction, general form and so forth, with those actually used in the indictment, and upon which the Government bases its case. They cannot be considered by you as constituting separate or additional crimes, but only for the limited purposes as above stated. You are reminded that the writings that are crucial are those set forth in the indictment, and that the other material is submitted only for the limited purpose of making comparisons, and to aid you in determining whether or not the defendant mailed or circulated through the United States mails, the post cards and letters set forth in the indictment, in violation of the Federal Law."