UNITED STATES of America, Appellee,

v.

Richard KILCULLEN, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Francis Ashby REDDALL, Jr.,
Defendant, Appellant.

Nos. 76–1022, 76–1023.

United States Court of Appeals,
First Circuit.

Argued June 4, 1976.

Decided Aug. 31, 1976.

Certiorari Denied Feb. 28, 1977.
See 97 S.Ct. 1175.

John Silas Hopkins, III, Boston, Mass., with whom John M. Harrington, Jr., Ropes & Gray, Boston, Mass., Robert Felleman, and Felleman & Lutch, Brookline, Mass., were on brief, for Richard Kilcullen, appellant.

David A. Mills, Danvers, Mass., by appointment of the Court, with whom Walter J. Hurley, and George V. Higgins, Inc., Boston, Mass., were on brief, for Francis Ashby Reddall, Jr., appellant.

Henry H. Hammond, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on briefs for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Richard Kilcullen and Francis Ashby Reddall, Jr., were convicted by a jury of the interstate transportation of two forged, falsely made, and counterfeit checks, in violation of 18 U.S.C. § 2314 and § 2, and of conspiracy to commit that offense, 18 U.S.C. § 371. They were indicted with three others, Edward Lloyd Street, Carl Thomas Bannon, Jr., and Jerome Fleet Cowden, but were tried only with Bannon.[1]

On appeal, Kilcullen and Reddall contend that the evidence was insufficient to support their convictions. Kilcullen also con-

---

1. After the jury verdicts were returned, the court entered a judgment of acquittal on one of the two substantive counts, on the ground that *the concurrent transportation of two checks amounted to only one substantive offense.*

Kilcullen, Bannon, and Street all testified at trial. Previously tried and convicted for his participation, Street was called by the Government, claimed his fifth amendment privilege, and finally testified upon receiving a grant of immunity, 18 U.S.C. § 6003.

tends that the court's instructions to the jury were erroneous, and Reddall asserts error with respect both to the order of presentation of evidence and the introduction of certain exhibits. We affirm the judgments below.

## I

The crimes charged related to the transportation between Boston and New York City of two checks, each for $97,500, that were purportedly drawn by one Charles Brennick and endorsed in blank by the payee, one Jacob Weiner. As it turned out, the checks and Brennick's signature were fraudulent, and the payee non-existent. Codefendant Reddall, Brennick's bookkeeper, was allegedly the insider who helped arrange and cover up the fraud, while the others, including Kilcullen, allegedly played various roles in transporting and depositing the checks and syphoning off the proceeds.

We first consider the case against Kilcullen, setting forth the evidence in a light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Kilcullen, a respected New York attorney, helped arrange for the deposit of the two checks in a New York bank and was an advisor and confidant of Street, the man who brought the checks to New York from Boston and later negotiated them. The evidence is undisputed that Kilcullen knew of the checks and was privy to many of the activities of Street and others, but Kilcullen maintains that he was unaware that the checks were fraudulent. The principal question, therefore, is whether there was enough evidence from which the jury could find beyond a reasonable doubt that Kilcullen knew that the two checks, at the time they were transported, were bad.

In December, 1973, Kilcullen had just become associated with a well-regarded law firm in New York City after having given up a partnership practice of his own. The jury could have found that, at this time, he was in some financial trouble, owing money to several creditors. Kilcullen had since 1971 known Street—Street being an entrepreneur of sorts and an insurance salesman who lived in Massachusetts. Street and Kilcullen had collaborated in a number of unsuccessful business ventures.

One of Street's ventures consisted of the purchase early in 1973 of the charter of the Island and Overseas Bank, Ltd. (IOB) of Tortola, British Virgin Islands. IOB was a corporate shell, without paid-in capital, assets, or employees. By December of 1973, Street had defaulted on the payments due the person from whom he had purchased the bank, although the seller, according to Street, had not rescinded the transaction as authorized in case of default. While Kilcullen was to hold himself out as Secretary of IOB, and testified that he satisfied himself as to its bona fides, he denied any knowledge whatever of the shaky status of Street's purchase arrangements.

On December 3, 1973, Street travelled to New York City and, in company of Kilcullen, opened an account for IOB at a branch office of Bankers Trust Co. (Bankers). A check for $1200, later returned as drawn against insufficient funds, was deposited in the new account. Kilcullen, whose law firm was located in the same building, and was a very good account of Bankers, introduced Street to Littlejohn, the branch manager, and Kilcullen signed the signature card as Secretary of IOB, Street signing as President. (After the account was opened, Littlejohn called the managing partner of Kilcullen's law firm who verified that Kilcullen had joined the firm earlier that year and vouched for his integrity.) Littlejohn testified to being told by Street that the account would be very inactive, and that IOB had $1,000,000 paid-in capital.[2] After opening the account, Street and Kilcullen

---

**2.** Though denied by Kilcullen in his own testimony, this representation was recorded by Littlejohn in an intra-office memorandum dated December 3, which was introduced at trial. On cross-examination, however, Littlejohn conceded that it was possible that Street had said only that IOB had $1,000,000 authorized capital, not paid-in capital. Littlejohn understood, in any event, that IOB was not a sizeable bank and that it had "very minimal" assets.

continued to meet on other matters, and Street then returned to Boston.

On December 6, a few days after the IOB account had been opened, Street testified to being asked by codefendant Bannon to perform some work for the client of an attorney whom Bannon knew.[3] The "work" consisted of processing two checks and retaining and distributing the proceeds as ordered. Street expressed interest and suggested a tentative $10,000 fee. A meeting with this attorney was arranged for the following day, a Friday, at Bannon's office in Boston. Later that afternoon or evening Street called Kilcullen in New York to sketch out this proposal and get Kilcullen's advice. Kilcullen advised that he saw no problems, cautioning Street only to be sure to have the attorney identify himself and vouch for his client.[4]

The meeting on the following day, December 7, was, according to the testimony, brief. The attorney, codefendant Cowden, allegedly produced personal identification, had Street produce the same, and then gave Street two checks, each for $97,500. The checks, identical except for their serial numbers, were drawn on the Watertown, Massachusetts, bank account of a. Charles Brennick; were apparently signed by Brennick; and were payable to and endorsed in blank by a Jacob Weiner. They were postdated December 10, a fact which Street testified he did not notice until a couple days later. Cowden, according to Street, identified Weiner as his client and vouched for the genuineness of the endorsements. Street did not inquire why Weiner was seeking his services to negotiate the checks.[5]

After the meeting broke up, Street telephoned Kilcullen again and reported that Cowden had identified himself adequately and had asked Street to deposit two checks and then await further instructions. Kilcullen testified that Street also said how much the checks were for, and may have said that IOB would receive $5,000 to $10,000 for its services. (Kilcullen conceded in other testimony that this seemed to be an unusually large fee.) They did not discuss any fee for Kilcullen for his services in this transaction.

There was evidence by an FBI handwriting expert that the two checks were written on counterfeit blanks copied from used, genuine Brennick forms, and that the Brennick signatures had been traced from originals. Brennick testified at trial that he had neither written the signatures nor authorized anyone else to write them. He also stated that he did not know any Jacob Weiner (nor was the FBI able to locate any such person in the course of its investigation).

On Monday, December 10, Street returned to New York with the two Weiner checks and deposited them at Bankers. He

---

**3.** Bannon, a business associate of Street, was a "money broker". His business involved arranging loans and similar financial transactions for clients. Street had visited Bannon at his office several times during the past three or four months, and often talked to him on the telephone.

**4.** Kilcullen testified that he phoned Littlejohn the next morning to get Littlejohn's opinion as a banker of the proposed transaction. Littlejohn saw no problems, according to Kilcullen. Littlejohn in his testimony did not, however, refer to any such phone call. Indeed, his testimony that he himself called Kilcullen on the tenth to question Street's deposit of two checks, see text infra, would suggest that he had no advance notice of the transactions and that Kilcullen had not called him on December 7.

**5.** There were varying accounts, mostly in the course of changes in Street's own testimony, regarding what services Street was engaged to perform and what arrangements were made for his fee. Street testified that Bannon, during the initial phone call on December 6 had said there was a possibility that Street would be asked to transfer the funds overseas. There was also testimony by Street that at this meeting he and Cowden did not discuss any services to be performed by Street other than simply negotiating the checks and disbursing the proceeds; and contrary testimony by Street that they did discuss the possibility of different forms of investment for the proceeds of the checks. The jury could have believed from all this that Street was employed to perform no more than the simple tasks of negotiation and disbursement.

looked in on Kilcullen afterwards, ostensibly on other business, before returning to Boston. While Street was in Kilcullen's office, Cowden phoned from Boston and spoke to both Street and Kilcullen to confirm that the checks had been deposited. Street again told Kilcullen that IOB could stand to receive $5,000 or $10,000 for the transaction.

Later that day, according to Littlejohn's testimony, he phoned Kilcullen and repeated his understanding that the account was to be inactive. Kilcullen assured him that the transaction was entirely legitimate.[6]

A few days later, on December 12 or 13, Street and Bannon discussed fees. A total figure of $35,000 for the transaction was mentioned—$25,000 for Bannon and $10,000 for IOB.[7] Kilcullen was not present, and he and Street testified that these sums were not brought to Kilcullen's attention until later.

On December 17, Cowden called Kilcullen. He said that Weiner wanted some of his money, and asked Kilcullen to have Street contact him. (Street's telephone service had been discontinued because of non-payment of bills, and Street testified that he would call Kilcullen in New York once or twice daily for messages.) Kilcullen advised Street that Weiner wanted about half the money, and Street then called Cowden who supposedly said that Weiner wanted $80,000, and that the balance was to be retained. Cowden confirmed that $35,000 was acceptable for the fees. Street called Kilcullen back later and told him that Cowden had confirmed a $10,000 fee for IOB, but not, Street testified,

that Bannon was to receive $25,000. The two Weiner checks had in fact cleared that very day, and so the proceeds at Bankers were available for withdrawal in accordance with Cowden's request.[8]

The next day, December 18, Street returned to New York and Bankers. Street first stopped by Kilcullen's office, saying that he was on his way to pick up cashier's checks and that he planned to open an account in Boston with them. He then went downstairs and withdrew $100,000 in ten $10,000 cashier's checks, payable to the Lincoln Trust Company.[9] Street also wrote five checks on the IOB account: two payable to himself, each for $2,000; two payable to Kilcullen, each for $2,000; and one payable to Kilcullen's law firm, for $1,000. Of the two checks to Kilcullen, one was asserted to be a personal loan[10] and one part payment for legal services which Kilcullen had rendered to Street in the past (the full amount owed supposedly totalling around $50,000).

The following day, December 19, back in Massachusetts Street opened a savings account in his own name at the Marshfield branch of the Lincoln Trust Co. He testified that "[w]e were planning to open up a commercial account" but because of state limitations on commercial savings accounts it was decided to open a personal account (the use of "we" was explained as meaning IOB and himself). Street at first left all ten checks at the bank, but retrieved one and gave it to Bannon after learning that there would be a delay before he could withdraw funds. Immediately after making the deposit, Street informed Kilcullen, Cowden, and Bannon of the fact by tele-

---

**6.** Kilcullen denied receiving this telephone call. See note 4 *supra*.

**7.** There was considerable testimony, some of it evasive and contradictory, as to whether Bannon's $25,000 was a line of credit, i. e. a loan, or an outright fee.

**8.** Kilcullen testified that Littlejohn called him on the seventeenth to tell him the checks had cleared, and that he in turn had relayed the information to Street. Littlejohn did not recall making such a call.

**9.** Littlejohn testified that Street was accompanied by Kilcullen. Both Street and Kilcullen testified that Street was alone.

**10.** There was testimony that this loan was payable on demand and secured by a note of Kilcullen; however, the note was not introduced at trial and, by the time of trial, the loan had not yet been repaid. Kilcullen testified that he had not repaid it since demand had not yet been made presumably by Street, acting for IOB.

phone. Street then encountered unexpected difficulty withdrawing funds from the account, possibly, the jury might have believed, because personnel at the bank had earlier had trouble collecting a delinquent account from Street, and may have been startled at his sudden wealth. Although the nine checks were cashier's checks, Lincoln Trust insisted upon written confirmation from Bankers first. Confirmation was not forthcoming until December 27, eight days later. In the meantime, Street pressed Lincoln Trust to release at least some of the money, saying that he had to meet a "payroll". Phone calls passed among Street, Lincoln Trust, Bankers, Cowden, and Kilcullen, and visits were paid by Street to Lincoln Trust and by Kilcullen to Bankers, all to attempt to expedite matters and all seemingly to no avail. Because Cowden was allegedly in a hurry, Street wrote two checks for Cowden totalling $25,000 on funds remaining in the IOB account at Bankers for part of the requested $80,000.

Finally on December 27, the cashier's checks cleared, and Street immediately withdrew, in cash, the balance of Cowden's request, $55,000, and delivered the cash to Cowden by the side of a highway in Marshfield or nearby Pembroke, Massachusetts. Street called Kilcullen in New York both before and after this delivery to Cowden,

purportedly because Street wanted to keep someone informed of his whereabouts while he was carrying so much cash. When Street called Kilcullen back after the delivery, Kilcullen asked Street to come down to New York that afternoon. Street did and Kilcullen had him run through the entire transaction. It was then, Street testified, that he told Kilcullen that $35,000 had been set aside in fees for this transaction. At this time, Kilcullen requested and received from Street a check for $10,000 written on the IOB Bankers account. According to Street's and Kilcullen's testimony, this was an unsecured loan to Kilcullen, Street deeming Kilcullen a good credit risk for IOB to lend money to.[11]

Street wrote a number of other checks on the IOB account and made other withdrawals from the Lincoln Trust account during this period. Suffice it to say, without detailing them, that the amounts payable either to himself or for what appear to have been his personal expenses well exceeded his alleged $10,000 fee.

## II

■ We turn to Kilcullen's assertion that the evidence was insufficient to show that by December 10, when Street transported the checks interstate from Massachusetts to New York, Kilcullen knew they were forged, fraudulent or counterfeit.[12]

11. There was testimony that the preceding April Kilcullen had borrowed $10,000 from an acquaintance, promising to repay it in two or three weeks. He had not repaid by December, however, by which time liens had been levied against his house for other debts. In November, the lender advised Kilcullen that he intended to initiate proceedings to attach Kilcullen's interest in his former law partnership. Proceedings were begun, but were terminated when Kilcullen paid off the loan in late December after receiving the $10,000 from Street.

12. Kilcullen also contends that the court did not adequately inform the jury, in its instructions, that guilty knowledge had to be established as of the time of the interstate transportation. However, when explaining the elements of the offense, the court instructed that the Government had to prove that "at the time the defendants acted, if you find they caused the transportation of the checks across state lines, that they knew the checks were forged or

counterfeited or falsely made." Given this express instruction, and reading the charge in its entirety, we hold it was adequate. Counsel did not, moreover, register an express objection before the jury retired as required by Fed.R. Crim.P. 30. We do not rest on this point, because the record contains some suggestion that the court may have cut counsel short in the process of requesting a reinstruction, conceivably although not necessarily on this point. But on any construction, we do not find reversible error.

Kilcullen also contends, in this same vein, that the Government relied primarily on "post facto" evidence of knowledge, i. e., evidence tending to show only that he knew the checks were fraudulent after the interstate transportation had occurred. However, the Government's evidence was not wholly "post facto," see text infra, and events subsequent to the interstate transportation were germane to the issue of Kilcullen's prior knowledge.

■ Before examining the evidence, however, we first consider the effect, if any, of Kilcullen's failure at trial to lay the required predicate to an evidentiary challenge. In order to challenge the sufficiency of the evidence after a criminal conviction, the appellant must first have moved for acquittal at trial. *E. g., United States v. Czaplicki*, 446 F.2d 640 (9th Cir. 1971); *United States v. Haney*, 429 F.2d 1282 (5th Cir. 1970). Kilcullen moved for acquittal at the close of the Government's case, and that motion was denied. But he did not renew his motion after he and codefendant Bannon had completed putting in evidence in their defense. Kilcullen acknowledges that "there are cases that hold a failure to renew such a motion by a defendant who has presented evidence to constitute a waiver of the motion, *e. g., United States v. Larson*, 507 F.2d 385, 387 (9th Cir. 1974)". This circuit happens to be one of the many where this rule is well established. *Malatkofski v. United States*, 179 F.2d 905, 910 (1st Cir. 1950); *accord, United States v. Childress*, 347 F.2d 448 (7th Cir. 1965), *cert. denied*, 384 U.S. 1012, 86 S.Ct. 1936, 16 L.Ed.2d 1030 (1966); *United States v. Manos*, 340 F.2d 534 (3d Cir. 1965); *Lucas v. United States*, 325 F.2d 867 (9th Cir. 1963); *Hughes v. United States*, 320 F.2d 459 (10th Cir. 1963), *cert. denied*, 375 U.S. 966, 84 S.Ct. 483, 11 L.Ed.2d 415 (1964); *Jasso v. United States*, 290 F.2d 671 (5th Cir.), *cert. denied*, 368 U.S. 858, 82 S.Ct. 97, 7 L.Ed.2d 55 (1961); *see also Maffei v. United States,* 406 U.S. 938, 92 S.Ct. 1789, 32 L.Ed.2d 138 (1972) (Douglas, J., dissenting from the denial of certiorari); *United States v. Calderon*, 348 U.S. 160, 164 n.1, 75 S.Ct. 186, 99 L.Ed. 202 (1954); 2 C. Wright, Federal Practice and Procedure § 463 (1969).

■ Kilcullen attacks the rule, and argues that it should be replaced by one to the effect that a conviction based on legally insufficient evidence is invariably plain error. *United States v. McIntyre*, 467 F.2d 274, 276 n.1 (8th Cir. 1972), *cert. denied*, 410 U.S. 911, 93 S.Ct. 972, 35 L.Ed.2d 274 (1973). *Cf. United States v. Rizzo*, 416 F.2d 734, 736 n.3 (7th Cir. 1969); *Cephus v. United States*, 117 U.S.App.D.C. 15, 324 F.2d 893

(1963); Comment, The Motion for Acquittal; A Neglected Safeguard, 70 Yale L.J. 1151 (1961); 8A Moore's Federal Practice ¶ 29.05 (2d ed. 1976). But while doubtless no court would sustain an essentially unfounded conviction, we think it correct to insist that evidentiary challenges be put in the first instance to the trial judge, who is in the best position to rule on such matters; and when this is not done, the appellant must then demonstrate "clear and gross" injustice, *Malatkofski v. United States, supra*, or "manifest injustice" before the conviction is overturned on that ground. *United States v. Principe*, 482 F.2d 60, 61 n.1 (1st Cir. 1973); *accord, United States v. Larson*, 507 F.2d 385 (9th Cir. 1974); *United States v. Croxton*, 482 F.2d 231 (9th Cir. 1973); *O'Neal v. United States*, 411 F.2d 131 (5th Cir.), *cert. denied*, 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77 (1969); *Corbin v. United States*, 253 F.2d 646 (10th Cir. 1958).

■ Here we do not find manifest injustice and, indeed, we do not, even under the ordinary standard, find the evidence of Kilcullen's timely guilty knowledge so inadequate that "a rational juror drawing reasonable inferences . . . from the evidence viewed in the light most favorable to the government . . . could [not] have found guilt beyond a reasonable doubt." *Villarreal Corro v. United States*, 516 F.2d 137, 140 (1st Cir. 1975) (citations omitted). The circumstantial evidence which tended to show guilty knowledge did not, to be sure, compel a finding of such knowledge. *See United States v. Klein*, 522 F.2d 296, 302 (1st Cir. 1975). But we think that reasonable jurors, considering all the evidence, could be convinced beyond a reasonable doubt that Kilcullen was implicated in the criminal plan by the early part of December when the transportation occurred. *United States v. Cruz Pagan*, 537 F.2d 554 (1st Cir. 1976), *citing United States v. Currier*, 454 F.2d 835, 838 (1st Cir. 1972); *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964).

Many factors lead to this conclusion, no one of which is dispositive, but certainly one

of the most compelling indicia of guilt is the disparity between Kilcullen's self-characterization as playing merely a lawyer's role, and the palpable irregularity, not to say bizarreness, of the transactions he endorsed. In continual contact with Street, he participated personally in the rapid disappearance of the funds which his "client" was supposedly holding for another, himself demanding and taking $14,000 from the proceeds of the two Weiner checks. He and Street asserted that the $2,000 Kilcullen received was payment for past legal services and $12,000 was loaned. Possibly the $2,000, by itself, would have seemed proper, as it was ostensibly taken out of Street's own $10,000 fee (assuming that this sizeable fee could be explained). The remaining $12,000, however, could only have come out of the proceeds which Street was holding for Weiner, ostensibly, if Street's and Kilcullen's stories are believed, in some sort of fiduciary role. Calling these payments bank loans scarcely purges them of taint. Kilcullen, an experienced corporate lawyer and former Harvard Law Review editor, would have known that he was borrowing money that he had no right to take and that his client had no business advancing. The notion that these were bank deposits which Street could legally loan at will to impecunious friends seems an obvious absurdity, especially coming from one with Kilcullen's background and training.

That Kilcullen was, in addition, experiencing financial difficulties provided the jury with additional circumstantial evidence of his involvement in these transfers. As of trial, the loans had not been repaid. Given the evidence of Kilcullen's other overdue obligations, the jury could have inferred that he never intended to repay these sums at all, leading to the further conclusion that Kilcullen either was a participant in the forgery scheme and was entitled to a share of the take, or else at least realized that the checks were fraudulent and therefore did not fear any legal recourse from the perpetrators of the crime, lest they reveal their own complicity. While Kilcullen's personal receipt of funds occurred after the date of the interstate transportation, there were facts from which to relate this evidence of knowledge and complicity back to events earlier in the month.

Indeed, the circumstances surrounding the December 3 opening of the IOB account were themselves somewhat suspect. The jury could have believed that Street lied to Littlejohn that IOB had $1,000,000 paid-in capital when he opened the account, and that Kilcullen stood by silently. As the account was opened the day the Brennick loan was due, see infra ; as its opening seemed tailored to what later happened; as Street and Kilcullen were close friends; as Street's relationship with IOB was clouded; and as the need for such an account at such time must surely have been a question in Kilcullen's mind at the time he helped Street open it, the jury—putting these facts together with many others—might infer that Kilcullen's participation in opening the account was not merely that of a lawyer helping a client.

There were also contradictions between Kilcullen's and Littlejohn's testimonies. Littlejohn testified that he phoned Kilcullen on December 10 after Street had deposited the checks; Kilcullen denied this. Kilcullen testified that he cleared the transaction ahead of time with Littlejohn on December 7; while Littlejohn did not mention a call on that date, it would have been inconsistent with the December 10 call which he did relate. See note 4, supra. Littlejohn testified that Kilcullen accompanied Street when he withdrew the $100,000; Kilcullen denied this. Viewing the evidence in the light most favorable to the Government, the jury could have believed Littlejohn. These were relatively minor occurrences and substantively would be far from conclusive of guilt, but the contradictions had the effect of impeaching Kilcullen's credibility. Furthermore, the differences in Kilcullen's and Littlejohn's accounts were not neutral: Kilcullen's version tended to favor his claim of innocence by suggesting that Littlejohn himself had given his approval to the proposal which Bannon and Cowden allegedly had made to Street and by minimizing Kil-

cullen's own direct involvement. The jury could have inferred that Kilcullen was re-shaping certain details in order to paint himself in the best possible light because he indeed did have something to hide.

We note a few other bits of telling evidence which, taken together, further enshroud the events of which Kilcullen admitted he was aware in a suspicious light. There was the $10,000 fee paid to Street simply for cashing two checks and holding the proceeds. There was the fact that Street was given two checks totalling $195,-000 and endorsed in blank by an attorney whom he had never met (and whom Kilcullen said he looked for but could not find in Martindale & Hubbell). There was Kilcullen's own testimony that it was not consistent with New York banking law for a bank without paid-in capital to engage in financial transactions such as IOB was engaging in. And there was the extremely close association between Street and Kilcullen, despite their residences in Massachusetts and New York, (to the point that messages for Street in Boston were phoned in to Kilcullen in New York, at a time when both were financially strapped). Street, to whom the evidence pointed even more strongly than it did to Kilcullen,[13] seems to have consulted with Kilcullen almost daily, and shared with him practically every twist and turn in the chain of events. The jury could have concluded that Street also shared with Kilcullen his guilty knowledge.

There is finally the fact that Kilcullen voluntarily took the stand, giving the jury an opportunity to hear his story and determine his credibility. As noted, some of his testimony clashed with Littlejohn's testimony, and there were other parts that were either contradicted by other evidence or were circumstantially implausible: that Kilcullen was not himself in financial straits; that he could see nothing wrong with taking checks for himself from the money Street was holding; that others of the bizarre events of December were, in effect, normal, everyday matters in the life of a reputable corporate lawyer. It has been said

> "Nor can there be any question that if the jury were satisfied from the evidence that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right not only to take such statements into consideration in connection with all other circumstances of the case in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defence made or procured to be made as in themselves tending to show guilt. The destruction, suppression or fabrication of evidence undoubtedly gives rise to a presumption of a guilt to be dealt with by the jury." *Wilson v. United States*, 162 U.S. 613, 620–21, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896).

*Accord, Andrews v. United States*, 157 F.2d 723 (5th Cir. 1946) (per curiam), *cert. denied*, 330 U.S. 821, 67 S.Ct. 771, 91 L.Ed. 1272 (1947); *Seeman v. United States*, 96 F.2d 732 (5th Cir.), *cert. denied*, 305 U.S. 620, 59 S.Ct. 80, 83 L.Ed. 396 (1938).

We conclude, therefore, that there was ample evidence from which to conclude that Kilcullen's involvement was not innocent, that like Street he was aware that he was dealing with bogus checks, and that this awareness went back to the beginning of December.

■ Kilcullen also argues that the court erred in instructing the jury that they could find the checks were forged under 18 U.S.C. § 2314 if they found that Brennick did not

---

**13.** There were Street's misrepresentations to Littlejohn concerning IOB's financial standing; the excessive fee which Street himself proposed and received; the even more excessive $35,000 total fee; the fact that a complete stranger entrusted two $97,500 checks, endorsed in blank, to Street without Street raising any questions; the circuitous routing of the checks and of their proceeds; and Street's own apparently unhampered spending of the proceeds for his own personal needs. Furthermore, Street seems to have given a markedly poor performance on the witness stand, being inconsistent and contradicting himself on various material points.

know a Jacob Weiner and that the Weiner endorsement was written by an unknown person. Kilcullen contends (1) that a forged endorsement is not a forgery under § 2314, citing primarily *Streett v. United States*, 331 F.2d 151 (8th Cir. 1964), and (2) that under the fictitious payee rule of commercial law, the endorsement described in the court's charge could have been perfectly valid. We do not reach either contention, however, because Kilcullen neither objected to the challenged instruction nor requested his own instructions, Fed.R.Crim.P. 30, and we do not find plain error. Fed.R.Crim.P. 52(b). Whatever could be said for these contentions, it is hard to believe that a jury would have found the distinctions of significance even had they understood them. Furthermore, the court, in addition to the instruction in question, charged alternatively that the jury could find that the checks were fraudulent if it found (1) that the Brennick signatures were not made by Brennick or someone acting under his authority, or (2) that the check blanks were counterfeit, i. e., imitations of genuine Brennick checks. There was more than ample evidence on both these theories.

### III

We turn now to codefendant Reddall's appeal, beginning with an account of the evidence as it bears upon his involvement. Much of the evidence against Reddall, who did not testify, came from Charles Brennick, the purported maker of the two checks. Brennick was the well-to-do developer and operator of a number of nursing homes. Reddall was his bookkeeper, responsible for managing Brennick's complex and detailed financial records. The Brennick enterprises had between thirty-five and fifty accounts at the Coolidge Bank and Trust in Watertown, Massachusetts, of which one was Brennick's personal or "master" account. The two bogus Weiner checks were drawn on this latter account, which was used as a clearinghouse for all the accounts, among which funds were con-

tinually being transferred because of the uneven cash flow in the nursing home business. Reddall had considerable responsibility for this interchange of funds: he contacted each home daily to ascertain its cash needs. He also kept in his desk a supply of blank checks from each home's account which were made payable to and pre-signed by Brennick. Reddall could thus transfer funds from a home's account to the master account without having to consult Brennick.[14]

Brennick testified, and other evidence confirmed, that Reddall was an intimate friend and associate of Jerome Cowden, the attorney who first is alleged to have surfaced with the Weiner checks, claiming the apparently fictitious Weiner as a client. Reddall had lived with Cowden for several years and on three occasions had arranged for Cowden to meet with Brennick to discuss various business proposals, none of which materialized. And in early December, Brennick testified, the two, who ordinarily were in close touch, seemed to be together even more.

Brennick also described his financial condition in early December. His cash position was then rather tight; his personal account was $237,000 overdrawn. He had negotiated a $1,400,000 loan back in September and expected it to come through on December 3. The loan would be more than adequate to enable Brennick to cover the overdraft and to repay a sizeable short term loan from Coolidge Bank. Only a handful of employees knew that this large sum was due. Reddall was one of them. The loan closing was, however, delayed and the money did not in fact arrive until December 10. It was deposited immediately in the accounts of two nursing homes and transferred into Brennick's personal account, in accordance with instructions contained in a memorandum from Reddall dated December 5. The Weiner checks, dated December 10, were debited against that account two days later,

---

14. These pre-signed checks were not used in the fraud. The Weiner checks were photocopied from a used Brennick check and were not

traced to checks regularly under Reddall's supervision.

having been deposited by Street in New York on December 10. Had they been negotiated much earlier, there would not have been sufficient funds to cover them.

There was evidence of Coolidge's procedure for handling overdrafts in Brennick's accounts and of specific overdrafts in the few weeks after the Weiner checks cleared. Since Brennick was a valuable customer, Coolidge would as a rule contact Brennick's office by phone, followed by a written notice, whenever an account was overdrawn. Brennick would then have until the following day to cover the deficit before a check would be returned unpaid. Reddall was the person who received the phone calls and written notices and who made the appropriate arrangements to cover the overdrafts. Brennick testified that he himself was not necessarily consulted by Reddall in handling such matters. Following the debiting of the Weiner checks, the following overdrafts were recorded: $24,000 on December 13; $91,838 on December 17; $54,000 on December 20; and $172,000 on December 21. These overdrafts would not have occurred if the two bogus checks had not been paid; and Reddall, were he honest and diligent, should presumably have realized from the amounts involved that something was amiss in Brennick's account. Yet the fraud was uncovered only in January when the statement and cancelled checks were received.

Finally, there was evidence that Reddall shortly after Christmas received $1700 from Cowden. By then Street had paid Cowden large amounts from the proceeds of the Weiner checks. There was additional evidence that Reddall was in need of money, and that, after loaning Reddall funds, Brennick had declined to make further advances to him.

## IV

■ Reddall asserts that the evidence was insufficient for a jury to have found him guilty either as an aider and abettor to the interstate transportation of the checks or as a coconspirator. We disagree. To find him guilty as an aider and abetter, *see* 18 U.S.C. § 2(a), the jury would have to find that he " 'associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his actions to make it succeed.' " *United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976) *quoting United States v. Peoni*, 100 F.2d. 401, 402 (2d Cir. 1938) (L. Hand, J.). "Participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result." *Id.*

■ There was ample evidence that Reddall associated with, participated in, and sought to make succeed the fraudulent check scheme.[15] He had an intimate working knowledge of Brennick's financial affairs and of the arrival of this particular loan, of which only a few other employees were aware. Brennick's tight cash position

---

15. Reddall suggests that the relevant venture with which he must be proven to have associated is the interstate transportation of the Weiner checks, not the forgery scheme, and as he himself was not shown to have transported the checks, he must be acquitted. But he mischaracterizes the relevant venture. The gist of the federal crime is the fraudulent check scheme. *United States v. White*, 451 F.2d 559, 560 (6th Cir. 1971), *cert. denied*, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972) *quoting Kasle v. United States*, 233 F. 878, 882 (6th Cir. 1916) (" 'The status of the articles, in the sense of being interstate or intrastate in character, cannot in the nature of things affect the fact either of the stealing or receiving alleged; and the statute, whether federal or state, is at bottom aimed against stealing or receiving.' "). A sub-

stantive violation of 18 U.S.C. § 2314 does not require proof of knowledge of the interstate character of the transportation. All that need be shown is knowledge that the checks were forged, falsely made, or counterfeit, together with the actual fact that they were transported interstate. *United States v. Strauss*, 443 F.2d 986 (1st Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *United States v. Tannuzzo*, 174 F.2d 177 (2d Cir.) (A. Hand, J.), *cert. denied*, 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed. 493 (1949). Section 2314 itself speaks of knowledge only in reference to the fraudulent nature of the checks, not in reference to the element of interstate transportation. The same applies, at least in this circuit, to one charged with aiding and abetting under § 2(a). *United States v. Strauss, supra*, at 988.

at the beginning of December indicated that it was important that the debiting of the Weiner checks be precisely coordinated with the arrival of the $1,400,000, thus requiring someone with inside knowledge. And Reddall was not merely an acquaintance but an intimate of Cowden, the person who handed the checks to Street and received the lion's share of the proceeds. Perhaps most significantly, Reddall, the employee whom the evidence showed would be notified of the overdrafts, apparently covered in December four sizeable overdrafts in Brennick's personal account subsequent to the debiting of the Weiner checks which either would not have occurred or would have been in much different sums had the Weiner checks not come through. The jury could have believed because of the continual flow of money among the various Brennick accounts, that Reddall, the bookkeeper charged with overseeing and coordinating those transfers, would have to know the balances in all the accounts, and must have realized when the bank advised of these deficits that large sums were unaccounted for. There was no evidence, however, that he brought these overdrafts to anyone's attention or took any steps to investigate. The jury could have inferred that he was attempting to cover up the deficits, at least for a time, because as a participant in the fraudulent check scheme he was aware of why the account was so low. True, it was Reddall who first brought the Weiner checks to Brennick's attention when the monthly statement arrived on January 7; but to attempt to hide the forgery at that point would have seemed a senseless act

that would only add to the appearance of guilt.

■ Turning to the sufficiency of the evidence on the conspiracy count, Reddall argues that the evidence was insufficient to show that he knew of the existence of any conspiracy.[16] He contends that the evidence at most sustains an inference that he supplied Cowden with used check forms from which to prepare the counterfeit forms and with the information that a large sum of money was soon to be deposited in Brennick's account. This, he contends, was insufficient to sustain a conviction under the conspiracy count, citing *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). However, the evidence described above from which the jury could infer that Reddall aided and abetted in the forgery and subsequent interstate transportation would also give rise to an inference that he entered into an agreement for that purpose. Evidence that he covered up the forgery for several weeks in December at which time other defendants were busily engaged in cashing the checks clearly supports a conclusion that he was a party to the overall scheme, particularly since no other reasonable explanation appears for his failure to disclose the discrepancy in Brennick's account. *Compare Ingram v. United States*, 360 U.S. 672, 678–79, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). And while the evidence connected him only with Cowden alone, an agreement with only one member of a larger conspiracy would be sufficient.

■ Reddall also argues that the district court erred in denying a motion he made

---

**16.** In contrast to the decisions relating to the substantive federal offense, *see* note 15 *supra*, there is some conflict as to whether an anti-federal element, here the knowledge of the interstate transportation, must be shown to hold a codefendant guilty on the conspiracy count. *See United States v. Greer*, 467 F.2d 1064 (7th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973) (holding that knowledge of interstate transportation is not required for conspiracy charge); *United States v. Crimmins*, 123 F.2d 271 (2d Cir. 1941) (L. Hand, J.) (holding that such knowledge is required); *Linde v. United States*, 13 F.2d 59 (8th Cir. 1926) (knowledge is necessary); W. La-

Fave & A. Scott, Criminal Law § 61, at 468 (1972); Model Penal Code, § 5.03, Comment (Tent. Draft No. 10, 1960) (arguing knowledge not necessary); Developments in the Law— Criminal Conspiracy, 72 Harv.L.Rev. 920, 937– 39 (1959) (criticizing rule requiring knowledge); *cf. McGunnigal v. United States*, 151 F.2d 162, 165 (1st Cir.), *cert. denied*, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469 (1945) (problem mentioned but not confronted). *See also Screws v. United States*, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *In re Coy*, 127 U.S. 731, 762–63, 8 S.Ct. 1263, 32 L.Ed. 274 (1888) (Field, J., dissenting). The issue is not raised and we need not rule definitively.

with respect to the order of proof.[17] Citing *Lutwak v. United States* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and *United States v. Honneus*, 508 F.2d 566 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), he asserts that the circumstances of this case were such that the *Honneus* instructions alone were inadequate to ensure that the jury would not rely on hearsay statements by coconspirators in assessing whether Reddall had entered into the conspiracy. The order of proof which he requested, he claims, would have been an effective safeguard against the premature consideration of such hearsay by marshalling it all at the end of the Government's case.

It may be that even proper limiting instructions cannot entirely prevent a jury from considering evidence, either consciously or unconsciously, for a purpose other than the limited purpose for which it may have been introduced. *Cf. Woodcock v. Amaral*, 511 F.2d 985, 994 (1st Cir. 1974), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). But there is a strong presumption that proper limiting instructions will reduce the possibility of prejudice to an acceptable level. *Cf. id.;* Fed.R.Evid. 105. *Honneus* instructions were given here on five separate occasions. We find no abuse of discretion in allowing the Government to introduce evidence in the order it chose. *Cf. United States v. Hathaway, supra*, 534 F.2d 386; 6 Wigmore on Evidence § 1867 (3d ed. 1940). Virtually none of the hearsay declarations of coconspirators which were admitted implicated Reddall as a participant in the alleged conspiracy, and three of Reddall's alleged coconspirators took the stand and were subject to cross-examination, thus serving to offset the inherent danger, if any. *See United States v. Rivera Diaz*, 538 F.2d 461 (1st Cir. 1976).

Reddall also argues that the district court erred in failing to grant his request for an instruction at the close of the Government's case, that the evidence was then closed as to him. Reddall did not offer any evidence in his defense and rested at that point; his two codefendants each put on a defense. He cites no authority, however, and we know of none, for the proposition that, when codefendants are tried jointly, an individual codefendant is entitled to such an instruction at the close of his own case. Moreover, we find no evidence of prejudice in the proceedings that thereafter occurred. As he was involved at a different stage of the events described at trial than were his codefendants, the jury could have had little difficulty in separating out the evidence bearing on his guilt from that bearing on his codefendants'. *Cf. United States v. Martinez*, 479 F.2d 824 (1st Cir. 1973). There was little mention of him at all in the course of the defense evidence. *See Woodcock v. Amaral, supra.* The court properly instructed the jury at the close of all the evidence that it was to consider the guilt or innocence of each defendant individually without regard to the guilt or innocence of any codefendant. *See Blumenthal v. United States*, 332 U.S. 539, 560, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

[11] Reddall's final argument is that the district court prejudiced him and thereby committed reversible error by denying his motion, made at the commencement of trial, to remove red-lettered FBI labels from four or five exhibits introduced at trial. *Cf.* Fed.R.Evid. 403. This argument is without merit. FBI involvement in the case was well known through the presence and testimony of agents. Such matters relating to the introduction of real evidence are peculiarly within the discretion of the trial judge, *see* 4 Wigmore on Evidence § 1157, at 340 (Chadbourn rev. 1972); McCormick on Evidence § 212, at 525 (2d ed. 1972).

*Affirmed.*

---

**17.** Reddall requested the following order of proof: (1) independent, non-hearsay evidence of substantive offenses; (2) independent, non- hearsay evidence of conspiracy; and (3) hearsay evidence.